46 Cal.App.4th 1635 (1996)
In re KRISTIN H., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent,
v.
KIMBERLY I., Defendant and Appellant. In re KIMBERLY I. on Habeas Corpus.
Docket Nos. H014212, H014894.
Court of Appeals of California, Sixth District.
July 1, 1996.
*1641 COUNSEL
Enid Evans Baggett, under appointment by the Court of Appeal, for Defendant and Appellant.
*1642 George W. Kennedy, District Attorney, Robert J. Masterson and Jeff Bryson, Deputy District Attorneys, for Plaintiff and Respondent.
OPINION
BAMATTRE-MANOUKIAN, J.
An indigent parent in a dependency proceeding has a right to appointed counsel where out-of-home placement of the child is an issue. (Welf. & Inst. Code, § 317.)[1] Effective January 1, 1995, section 317.5 has been added to the code. It provides that parties who are represented by counsel at dependency proceedings "shall be entitled to competent counsel." Today we consider the nature of this statutory right.
We believe section 317.5 reflects legislative recognition that dependency proceedings may "work a unique kind of deprivation" (In re Emilye A. (1992) 9 Cal. App.4th 1695, 1707 [12 Cal. Rptr.2d 294]) and implicate fundamental interests deserving of protection  both a parent's "fundamental liberty interests" in maintaining the parent-child relationship (In re Laura F. (1983) 33 Cal.3d 826, 844 [191 Cal. Rptr. 464, 662 P.2d 922]) and the child's "fundamental independent right" in being part of a family unit. (Adoption of Kay C. (1991) 228 Cal. App.3d 741, 749 [278 Cal. Rptr. 907].) In consideration of these compelling interests, which have been recognized as ranking "among the most basic of civil rights" (In re B.G. (1974) 11 Cal.3d 679, 688 [114 Cal. Rptr. 444, 523 P.2d 244]), we conclude that the Legislature's express provision for competent counsel for parents and children in dependency proceedings was intended to include a right to judicial review of claims of incompetence of counsel.
We therefore find in this case that the mother's claim of ineffective assistance of counsel, raised by petition for a writ of habeas corpus, is cognizable in this court. We further find that she has made a prima facie showing that the proceedings below violated her statutory right to counsel and that she was prejudiced thereby. (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Consequently, we will issue an order to show cause, returnable in the trial court, as provided at the end of this opinion.
In her appeal, which we consider together with the habeas corpus petition, the mother contends that the juvenile court's jurisdictional and dispositional orders were not supported by the evidence. We disagree and affirm the orders.

*1643 FACTUAL BACKGROUND
Kristin H. was four years and nine months old when she was taken into protective custody on September 20, 1994. She had lived with her mother all her life, with the exception of two months during the summer of 1994, which she spent with her grandparents in Connecticut.
On the night of September 20, 1994, the mother was upset over the recent death of a close friend. Around 7 p.m., she snorted a line of some substance she thought was either "coke or meth," which an acquaintance had offered her. She began to feel dizzy and numb and panic set in. She called her psychiatrist, Dr. Greg Sazima, and told him she had taken something and thought she was going to die. She called a neighbor and said she was paralyzed and could not move. She also called her sister and her boyfriend, Emilio Diaz. Diaz became concerned and called 911. At some point during the evening, a neighbor bathed Kristin and put her to bed.
Police and paramedics arrived at approximately 10:25 p.m. and found the mother lying on the kitchen floor. She explained she had snorted something and that it made her sick. In the bathroom the police found a mirror and a plastic straw containing a residue of white powder. These items had been left in a place which could be reached by Kristin, who was apparently in bed asleep when the police arrived.
The mother was cited for being under the influence of a stimulant and was taken to Valley Medical Center and placed on a 72-hour psychiatric hold. She was released the next morning. Kristin was taken into protective custody and placed in the children's shelter.
The previous week, on September 14, 1994, another incident had been reported to police by a neighbor. The neighbor reported that Kristin was wandering alone on the street while her mother slept, and that Kristin did not want to go home. The neighbor had reportedly heard the mother telling Kristin "I can't be bothered with you. I'm going to send you to the shelter." Another neighbor told police the mother had been upset recently. Police also interviewed the mother and the mother's psychologist, Dr. Robert Chamberlain, who had been treating the mother for approximately a year. Dr. Chamberlain stated that the recent death of a friend of the mother's had put her "in crisis." However, Dr. Chamberlain was comfortable with Kristin remaining in her mother's care at that time and the matter was not pursued.
Prior to this, there was a third incident in June of 1994. The mother was distraught over problems with her boyfriend and took an overdose of Xanax, *1644 a drug prescribed by Dr. Sazima for anxiety. Diaz, the boyfriend, called 911 and when emergency services arrived they found the mother in a deep sleep and nonresponsive. She was taken to the hospital and Kristin was taken into protective custody. The mother and the department of family and children's services entered into an informal supervision agreement, whereby the mother agreed to participate in individual and family psychotherapy and take her medication as prescribed.
To give the mother respite, and at Dr. Chamberlain's suggestion, Kristin spent the next two months, from June 16, 1994, to August 17, 1994, with her maternal grandparents in Connecticut, after which she returned to her mother's care. On September 2, 1994, the supervising social worker reported that she was concerned about the mother's stability and that the mother seemed overwhelmed by having her daughter back in her life.
Following the incident on the night of September 20, 1994, the department filed a petition under section 300, subdivision (b) (failure to protect), alleging in addition to the events of September 20, 1994, that the mother had a long history of mental illness and had attempted suicide on three occasions. Kristin was ordered detained on September 23, 1994.
Supervised visitation was authorized for the mother twice a week. The social worker initially conditioned the visits on the mother taking her prescribed medication. However, the mother's treating doctors advised the social worker that this was improper without a court order. Therefore visits were made contingent upon the mother's behavior. If she were combative, abusive or provoked staff at Clover House, visits would be discontinued.
An amended petition was filed September 27, adding an allegation that the mother refused to take her "psychotropic medication." It also alleged that the minor's father, Michael H., was incarcerated for probation violation and it summarized his criminal history, which included numerous prior convictions for violent crimes. Previous child protective services referrals involved the father's abusive behavior towards the mother and the minor. He had harassed and stalked the mother for years and had been convicted for felony stalking based on the mother's testimony.
A jurisdictional hearing was set for October 21, 1994, and was continued several times. On December 14, 1994, it was again continued to February of 1995, over the vigorous objections of the mother, who told the court that her daughter was suffering from the delay and wanted to come home. The mother had apparently been promising Kristin during visitation that she would be coming home. She told Kristin that she wanted to take her home *1645 but that "They won't let me." The court ordered the mother not to discuss the case with Kristin during visitation.
The visits during these first few months were characterized by a range of behavior and emotion. Observers noted that there was obviously a deep bond between mother and daughter. Often they cried together and talked about being reunited at home. Sometimes they sat and read books together or just held each other. They shared jokes and laughed. At other times, the mother raged against the "assholes" and "liars" who had a made a "big mistake" and were keeping her daughter from her. She complained loudly about her daughter's care at the foster home, about the incompetence of the social worker and about the rules at Clover House. She was particularly angry that the social worker had sent reports to the father revealing her current address, and that as a result he was now harassing her again.
On February 16, 1995, the social worker wrote an addendum to her October 21, 1994, report, recommending that Kristin be returned home to her mother. Visits were going well and the mother was focusing on her daughter "in a supportive and more positive manner." The mother had met with the foster mother, the child's therapist and the social worker and together they had engaged in a productive problem-solving session. The mother was amenable to suggestions. Her behavior at Clover House had improved. She had begun seeing Dr. Chamberlain again and was agreeable to taking her prescribed medication, which he believed helped her to cope. She had enrolled in a drug program and a parenting class and had indicated a willingness to participate in any other services the court might require. Kristin had been disruptive at her temporary foster home. She stated she wanted to go home to her mother.
The social worker made the following observations: "First, it appears that much of the mother's inappropriate and angry outbursts have been due to her being separated from the minor. Secondly, much of the minor's acting-out behavior has been due to the minor wanting to return home.... The mother is involved in therapy; is not abusing drugs; is willing to take her psychotropic medication; and to participate in drug counseling, drug testing, and parenting classes. She has never been abusive to the minor, and problems in the past have been centered around the mother being too upset to give the minor adequate attention. The minor and mother are clearly very bonded and attached, and as there is no other relative able to provide care to the minor, it is the investigator's opinion that this minor can best be helped by supporting this bond, returning the minor home with home supervision for 30 days, and offering the mother Family Maintenance Services."
On February 17, 1995, the court began the contested jurisdictional hearing. The hearing went longer than expected and the court set a date of March *1646 10, 1995, to complete it. The prospect of a further delay prompted an angry outburst from the mother, who left the courtroom. On March 10, 1995, the hearing was unable to go forward because the courthouse was flooded. The matter was rescheduled to May 11, 1995.
In her report of March 10, 1995, the social worker stated she continued to believe that it was in the minor's best interests to reunify with her mother "as soon as possible." Attached were positive reports from recent visits at Clover House. The social worker wrote that "[t]he mother has also been very attentive to such things as nutrition and medical care, providing adequate stimulation to this very bright child, teaching her child values, giving her child positive reinforcement, reading to her child, showing an interest in her child's activities, reassuring her child that she is loved and valued, and in general, focusing on being a good parent. She has consistently kept her visits with the minor at Clover House and has demonstrated through her actions that her child is her top priority."
The social worker noted, however, that "the mother copes very poorly under stress, and both the Court process as well as being separated from her child, have put her under tremendous pressure and stress, and appear to have escalated her mental health problems." The mother was unable to refrain from "inappropriate behavior" and angry outbursts, such as her outburst in court. Furthermore, although the mother insisted she did not use drugs, she had turned in several positive drug tests for marijuana over the past few months. The report concluded that "despite the mother's love for her child and strengths as a parent, her mental health problems presently appear too acute, and have been escalated by the pressures and stress of Court and separation from her child, as well as continued substance abuse." The worker recommended that Kristin not be returned home "[u]ntil these issues subside."
Shortly after receiving this report, the mother visited Kristin at Clover House. She was unable to keep her anger under control and began yelling at staff. Among other things she told Kristin: "[the social worker] is a bunch of crap. She's the one that's taking you away from me." The mother eventually calmed down and the rest of the visit went smoothly. The following week at visitation, however, the mother was again emotional and upset. In front of Kristin she roundly criticized the foster care, the court system and the Clover House. Staff decided to end the visit early and the mother resisted, holding Kristin, who was crying, in her arms. Staff called 911. The mother calmed herself and when police arrived and she was informed the visit was over, she released Kristin and told her she loved her more than anything else in the world. She told Clover House staff she was going to sue them.
*1647 On March 24, 1995, on the basis of reports of these two visits, the court suspended the mother's visitation until she had completed a psychiatric evaluation to assess her need for medication. She was ordered to cooperate with the evaluator and to obtain a statement regarding her medication needs.
On March 31 and April 5, 1995, the mother was evaluated by Dr. Kenneth Seeman. Dr. Seeman found the mother to be angry and agitated, "with much of the anger directed at those involved in taking custody of her child away from her." He observed no overt signs of depression or psychosis and found the mother to be generally well oriented and capable of abstract thought. However, he was "impressed by her enormous denial and distortion of her situation" and found that she tended to "externalize[] her problems, so that the fault lies with the social workers or police and not with herself." He found these features representative of "borderline, and to some extent antisocial personality disorders." He continued: "Her drug use is presented as incidental, but there does seem to be a tendency, at least during the past year, to misuse drugs or medications at times of extreme stress. This use has certainly impaired her ability to function as a mother at these times."
Dr. Seeman stated that the mother's therapy with Dr. Chamberlain had apparently been helpful as had her treatment with the medication. Despite this, however, she "continue[d] to direct her energy in inappropriate and ultimately self-defeating manners.... [F]or her to accept such medication again would be perceived as acknowledgment that some of the problem is internal and not external. She is unable to tolerate such a conclusion at this time." The doctor wrote that "a trial on some medication might be helpful," but he was "uncertain as to what the appropriate medication would be." He made several suggestions and then concluded that "[o]bviously, no medication is likely to be helpful unless the patient can agree to the use and participate in its management. At this point, that does not seem possible.... Without a trial on such treatment, it would seem to me that her defenses are such that her care of a child might be problematic. Although she might be a devoted and attentive mother much of the time, her potential for anxious, impulsive, and neglectful behavior might be a hazard."
The jurisdictional hearing reconvened on May 11, 1995, and, combined with the dispositional phase, was concluded on May 18, 1995. The social worker submitted an addendum dated May 18, 1995. She reported that out of 16 drug tests since December of 1994, the mother had tested positive for marijuana three times and for methamphetamines/amphetamines twice. The report attached a letter from Kristin's grandparents, who expressed concern that the mother and child be reunited as soon as possible for the benefit of both. The social worker reported that there had been no further visits *1648 between the mother and Kristin since the previous court order in March had suspended visits.
The social worker's report went on to quote extensively from Dr. Seeman's evaluation of the mother. Despite Dr. Seeman's recommendations, the mother continued to deny the need for medication and stated that she would not take medication. Instead, she expended considerable energy assessing blame to others, "more concerned with proving she is right than with doing what she needs to do to reunify with her child." The mother continued to demand that her child be returned to her but refused to cooperate with the services offered to facilitate this. "This is very unfortunate," the social worker wrote, "as the mother expresses much love for the minor and has invested a great deal in trying to be a good mother, and she and the minor appear to be quite bonded and attached." The social worker recommended that Kristin not be returned to her mother at this time. She quoted from Dr. Seeman's report, that without proper medication, the mother's potential for impulsive and neglectful behavior "might be a hazard."
Following testimony on May 18, 1995, the court heard argument and took the matter under submission. In the meantime, however, the court stated that Kristin should go no longer without seeing her mother and ordered that supervised visitation be reinstated, for one hour per week.
The court filed a statement of decision on June 19, 1995. This was now nine months after Kristin had been removed from her mother's custody and the court expressed deep concern about the delays. The court found that the evidence supporting the petition was "overwhelming." Kristin was in her mother's care and custody in June of 1994 when the mother took an overdose of prescription drugs and was again in her mother's care in September of 1994 when the mother used drugs and became incapacitated. Drug paraphernalia were left within Kristin's reach. The evidence showed that the mother had serious emotional problems which had been in existence in varying degrees since she was a child. According to Dr. Seeman's diagnosis, she had a "generalized anxiety disorder, mixed personality disorder, antisocial personality disorder, borderline personality disorder and histrionic personality disorder." She refused to take the medication recommended by treating physicians, which, according to Dr. Seeman, reflected an unwillingness to acknowledge that some of her problems were internal, not external. The court sustained the petition.
In regard to disposition, the court wrote: "Despite the extraordinary efforts of the social worker, the mother's continuing inability to follow medical advice makes it detrimental to return Kristin to her mother's care at this *1649 time." The visitation history revealed two very different sides to the mother. On the one hand she tended to overpower Kristin with her anger and hostility, eliciting her daughter's support in her rage against the world. This tended to place Kristin in highly volatile and stressful situations. On the other hand the mother had a tender and nurturing side. "This is the mother who works with Kristin on the educational activity books, shares the family photos, and recalls warm memories. This is the mother she has the potential to become on a full-time basis." The court expressed the hope that the mother would cooperate with her treating physicians and take her prescribed medication rather than continuing to direct her energy in an inappropriate and ultimately self-defeating manner. The court concluded the evidence was clear and convincing that it would be detrimental to return Kristin to her mother. Reunification services were ordered.
The mother filed a notice of appeal in her own words. In addition to her claim that the evidence did not support the allegations, she contended she did not receive effective representation because her attorney did not call witnesses in her behalf, and did not submit an independent psychiatric evaluation performed by a Stanford physician, which disagreed with Dr. Seeman's conclusions. The ineffective assistance of counsel issue is raised in the mother's petition for a writ of habeas corpus, which we discuss following the appeal.

THE APPEAL

I. Jurisdiction  Sufficiency of the Evidence

(1) The standard of review in juvenile dependency cases is the same as in other appeals on grounds of insufficiency of the evidence. We review the record to determine whether there is any substantial evidence, contradicted or not, which supports the court's conclusions. "All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible." (In re Katrina C. (1988) 201 Cal. App.3d 540, 547 [247 Cal. Rptr. 784].)
(2a) The mother argues that the evidence does not support the necessary finding under subdivision (b) of section 300, that Kristin had suffered, or that there was a substantial risk that she would suffer, "serious physical harm or illness, as a result of the failure or inability of her [mother] to adequately supervise or protect [her] ... due to the [mother's] mental illness ... or substance abuse."
We disagree. The evidence, which we will briefly summarize as to each allegation, supports jurisdiction.
*1650 Allegation b-1  "On or about 09/20/94, the minor was taken into protective custody by San Jose Police as the mother was taken into custody for narcotic influence and psychiatric hold." The mother argues that this allegation, even if true, does not support a finding that there was a substantial risk of serious harm to Kristin. She points out that she had arranged for alternate caretakers and that one incident of substance abuse, standing alone, does not support a finding of dependency. (See, e.g., In re Rocco M. (1991) 1 Cal. App.4th 814, 824 [2 Cal. Rptr.2d 429].)
The record does not bear out the mother's assertion that she had arranged for her child's care. According to her own testimony, she could not remember where Kristin was that evening. As she started feeling worse during the evening, the mother called friends, neighbors, relatives and her doctor in her concern about her condition. Although she stated she made these calls in part in order to protect her child, there is no indication that she asked anyone to come over and take care of Kristin. One of the neighbors apparently bathed Kristin and put her to bed. However the mother stated this was not done at her request, but that in her neighborhood everyone just helped each other when needed.
(3) The mother contends that subdivision (b) of section 300 is intended to apply only to those cases where a child is exposed to "a substantial risk of severe physical harm," and that this incident did not pose such a risk. (In re Rocco M., supra, 1 Cal. App.4th at p. 823.) Rocco acknowledges, however, that "evidence of past conduct may be probative of current conditions," and that in some cases a risk to a child's physical health and safety is inherent in the absence of adequate supervision and care. (Id. at p. 824.) (2b) Here the mother was taken into custody because she was under the influence of a stimulant and physically and emotionally unable to function. She had made no arrangements for the care of her child, who was not yet five years old, and she was in fact unsure where her daughter had been that evening. Moreover, this is only one allegation describing one incident. The petition was sustained on evidence supported by all of the allegations which indicated a pattern of behavior resulting in inadequate supervision.
Allegation b-2  "[A] straw and mirror used to snort the drug was found within [the] child's reach." The mother argues there was no showing how a straw and mirror found in a place within Kristin's reach could have harmed her. Aside from the white residue on the straw and mirror, which was not tested, no illegal drugs were found in the apartment. These circumstances, the mother argues, are not comparable to those in Rocco M., where the parent left illegal drugs in the home, in places where they were available to the child, the parent was absent for long periods, and the parent repeatedly *1651 exposed her child to the example of her own drug use. In contrast here, mother points out, she told her friend to get rid of the straw and mirror and thought he had disposed of it. No drugs were left available to Kristin.
While we agree that the circumstances of Rocco were more egregious, the evidence here nonetheless supports a finding that the mother's drug use posed a risk of harm to Kristin. The mother concedes she was snorting some illegal substance during the evening, with a virtual stranger, when Kristin was in her care and custody, and that the drug paraphernalia were left in a place where Kristin could see it and could have reached it. She made no effort to put Kristin to bed or to make sure the drug paraphernalia were disposed of. Although she claims she ingested only one "small line of speed" around 7, the reporting officer found her to be under the influence of a stimulant at approximately 11:30 that night. She had little memory where her daughter had been during this time. In sum, the point is not that the straw and mirror could have harmed Kristin, but that all of the circumstances, including leaving drug paraphernalia within Kristin's reach, indicated a gross lack of attention to the child's welfare.
Allegation b-3  "[T]he mother has a long history of mental illness with diagnosis of borderline personality, post-traumatic stress disorder, and major depression." The mother disputes this allegation. The only evidence of a long history of mental illness, she argues, consisted of hearsay statements collected by the social worker from her parents and her treating psychologist. The parents told the social worker that the mother had had behavior problems since nursery school. Although she graduated from college with honors, she had been unable to hold a regular job, could not get along with people, and had difficulty "staying level."
The mother had been seeing Dr. Chamberlain, for approximately a year prior to the September 20, 1994, incident. Apparently this had begun as part of the victim-witness program, to treat posttraumatic stress syndrome resulting from the longtime stalking by Kristin's father. In addition to posttraumatic stress disorder, Dr. Chamberlain told the social worker that the mother had depression and borderline personality under stress. He stated further that under stressful times the mother did not do a consistently good job of parenting. Since Kristin had returned from her grandparents' in late August, the mother had been in a "downhill spiral."
Dr. Chamberlain had referred the mother to Dr. Greg Sazima, a psychiatrist, who had prescribed medication for her. Dr. Sazima told the social worker that the mother suffered from borderline personality disorder, which was currently acute. She was not manic or psychotic but she did not show good judgment, particularly when she used drugs or alcohol.
*1652 The mother contends that these hearsay statements by her parents and her two doctors do not support a finding of mental illness. We disagree. (4) It is well settled that hearsay evidence contained in the social worker's report is admissible. (In re Malinda S. (1990) 51 Cal.3d 368, 373 [272 Cal. Rptr. 787, 795 P.2d 1244].) Moreover, there was additional evidence from Dr. Seeman, who evaluated the mother approximately six months after the incident of September 20, 1994. He found her to be a "very troubled woman" and diagnosed her as having a generalized anxiety disorder and a "high profile" of personality disorder.
Dr. Seeman concluded that without treatment the mother's care of her child "might be problematic" and that her potential for impulsive and neglectful behavior "might be a hazard." The mother claims such statements are not sufficient to support an allegation of a substantial risk the child would suffer serious physical harm. (5a) "Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be `infected' by the parent. The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety...." (In re Jamie M. (1982) 134 Cal. App.3d 530, 540 [184 Cal. Rptr. 778], fn. omitted.) (2c) The mother contends Dr. Seeman included no such examples and that his conclusions were entirely conjectural.
However, unlike In re Jamie M., illustrations of the effect of the mother's mental health problems on Kristin's safety and well-being were provided here by the other allegations in the petition and evidence in the record, such as the numerous reports from the visitation supervisors. In one such instance staff was obliged to call the police when the mother refused to physically release her daughter. Moreover, both of the mother's treating doctors stated shortly after the petition was filed that the mother's condition was such that Kristin should not be in her care at that time.
Allegation b-4  "[T]he mother refuses to take her psychotropic medication." The mother argues that there is no evidence that her failure to use medication had caused Kristin harm or posed a substantial risk of serious physical harm. On the contrary, all of the evidence supported the conclusion that the medication which had been prescribed for the mother (Zoloft) tended to stabilize her and was helpful for "depression, coping and general functioning." Her parents told the social worker that "the mother needs her medication and can't stay level without [it]." Dr. Chamberlain stated that the Zoloft "definitely helps."
The risk of harm to Kristin is evident in that the mother had apparently stopped taking her medication shortly before the incident on September 20, *1653 1994, when she succumbed to a severe anxiety attack, ingested illegal drugs and neglected to care for her daughter. The mother did not feel she needed medication, preferring instead to rely on her "inner strength." She also could not afford the prescriptions. She continued to refuse to take her medication, even though she herself admitted that it had helped, and even though her inability to "stay level" without it had led to the court order suspending visitation.
The evidence showed that the mother was unable to provide consistent parenting without her medication, particularly during periods of crisis. Her refusal to take her medication thus could lead directly to further neglect of Kristin's care and in a larger sense illustrated the mother's unwillingness to accept and acknowledge how her mental problems contributed to her situation.
Allegation b-5  "[T]he mother has attempted suicide on at least 3 occasions, and the minor reports seeing the mother laying on the floor on several occasions." This allegation is supported by evidence from the mother's parents that she had been suicidal two times when she was living in Connecticut and by evidence of the suicidal episode in June of 1994.
The mother contends this even if there were suicidal episodes when she lived in Connecticut, she left there in 1988, before Kristin was born, and thus those incidents could not have presented any danger of harm to Kristin. As to lying on the floor, she explained that this is where she does her recommended back exercises.
The mother's most recent suicide attempt in June of 1994 clearly posed a risk of harm to Kristin, who was in her mother's care when the mother took an overdose of her prescription drug Xanax and had to be rushed to the hospital. The mother downplays this incident, explaining that this was a stressful time, and that she was just trying to get some sleep. However, both her boyfriend and her treating psychiatrist characterized it as a suicide attempt. Dr. Chamberlain was also concerned and therefore recommended that Kristin spend several months with the grandparents, in order to give the mother respite.
The earlier suicidal episodes in Connecticut, while not directly endangering Kristin, are illustrative of the mother's mental health history and her inability to cope with stressful situations.
Cumulatively, the allegations here, all of which are factually based in the record, fully support a finding of substantial risk that Kristin would suffer *1654 serious physical harm due to inadequate supervision because of the mother's mental illness and substance abuse. (§ 300, subd. (b).) In addition to diagnosing the mother with a borderline personality disorder, the mother's treating psychologist and psychiatrist had both stated to the social worker that the mother was in crisis and that Kristin should not be in her care. Dr. Chamberlain characterized the mother's condition as a "downhill spiral," brought on in part by the demands of being a single parent. Dr. Sazima and Dr. Seeman agreed that the mother's drug abuse exacerbated her condition and impaired her already poor judgment and her ability to function as a mother. Twice she had taken drugs to the point of becoming incapacitated, without providing for Kristin's care. She would not regularly take medications which could have been helpful in stabilizing her mood swings and she refused to acknowledge that her problems could be internal rather than external. In times of stress, she resorted to drugs. And in denying any such drug use, despite overwhelming evidence to the contrary, she exhibited the classic symptoms of the substance abuser.
We affirm the order sustaining the petition.

II. Disposition  Sufficiency of the Evidence

(6a) At a dispositional hearing, the court's findings must be made on clear and convincing evidence. The court must find that the welfare of the child requires that she be removed from parental custody because of a substantial danger, or risk of danger, to her physical health if she is returned home and that there are no reasonable means to protect her without removing her. (§ 361, subd. (b)(1), Cal. Rules of Court, rule 1456(c).) On review, we employ the substantial evidence test, however bearing in mind the heightened burden of proof. (In re Victoria M. (1989) 207 Cal. App.3d 1317, 1326 [255 Cal. Rptr. 498]; In re Angelia P. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637, 623 P.2d 198].)
(7a) Here, the court completed the jurisdictional hearing and then proceeded directly to disposition. Only one further witness was heard, Michael Gammino, a licensed social worker, who was qualified as an expert in the assessment of risk and placement of children. Gammino also submitted a written report. Gammino had reviewed the case file and had spoken with Kristin and with the professionals involved with her, but he had not met or spoken with the mother. He recommended that Kristin not be returned to her mother.
Gammino stated that Kristin was very attached to her mother and wanted to return home. He believed she was suffering detriment from the loss of *1655 contact with her mother. However, he concluded that the attachment between mother and child was unhealthy because Kristin was concerned about her mother, appeared to assume a caretaking role and wanted to protect her mother, all of which resulted in a parentified child role.
Gammino had further concerns about the mother's substance abuse and about her tendency to act out her own anger in Kristin's presence. Such impulsive outbursts were traumatic to Kristin's emotional state and provided a model for negative social behavior. Gammino felt the mother had to learn that if she behaved in a negative and obnoxious manner, this would have an impact on how often she would be able to see her daughter. The child's needs must come first, Gammino concluded, and professionals would tend to those needs if the mother would not.
On cross-examination Gammino clarified that the mother's problematic behavior was her lack of impulse control and the inability to respect boundaries. This manifested in her expressing her anger, in Kristin's presence, towards others she perceived to be responsible for keeping her daughter away from her. Otherwise Gammino saw some "positive strengths" in the mother's parenting ability and felt she exhibited a profound tenderness and sensitivity towards her daughter.
Gammino was asked about a psychological evaluation of the mother performed by Dr. Charles DeLong. Gammino stated he had read the report but he disagreed with Dr. DeLong's assessment that the mother's abrasive personality was a minor characterological problem. He also did not agree with Dr. DeLong that the mother's outrage at the loss of her daughter was appropriate.
In addition to Gammino's testimony and written report, the court considered Dr. Seeman's evaluation and the social worker's various updates and addenda. His report, which we have summarized above, stated that the mother had a generalized anxiety disorder and mixed personality disorder, exacerbated by her abuse of drugs. She refused to accept responsibility for her situation and refused to take the medications which had proven helpful to her condition. Without these drugs, her anxious, impulsive and neglectful behavior "might be a hazard" to her child.
The social worker's last addendum, dated May 18, 1995, listed the mother's positive drug tests and noted that she had not completed a drug program because she was experiencing back problems. The worker expressed concern about the suspension of visitation for two months, since the mother and daughter were "quite bonded and attached." Kristin's grandparents wrote, expressed their feeling that the long separation from her mother *1656 must be "devastating" to Kristin. They urged that mother and child be reunited as soon as possible.
The court acknowledged in its statement of decision that there was obviously a deep love between the mother and the child in this case. However, the court stressed the mother's unwillingness to work with the professionals and to follow medical advice. Further, the mother's inappropriate and angry outbursts during visitation caused the child stress, fostered hostility and placed her in the midst of highly volatile encounters.
The court found the evidence was "clear and convincing that it would be detrimental to return Kristin to her mother at this time." (6b) The code provides that a dispositional order placing the child in out of home custody must be supported by clear and convincing evidence that there is or would be "a substantial danger to the physical health of the minor ... if [she] was returned home ... and ... no reasonable means by which the minor's physical health can be protected without removing the minor...." (§ 361, subd. (b)(1); see also Cal. Rules of Court, rule 1456(c).) Although the court did not articulate this exact standard, it did specifically refer to and adopt the findings of the social worker in the report dated October 21, 1994, which included the correct language from section 361.
The mother argues that a "mere recitation" of the statutory language is insufficient to sustain an order awarding custody to a nonparent because the findings supporting disposition provide "the basis upon which state intervention in the familial relationship is justified." (In re Jamie M., supra, 134 Cal. App.3d at pp. 535-536.) The heavier burden of proof at the dispositional stage of dependency proceedings is intended to protect the fundamental right of a parent to retain custody of a child. Thus section 361 was intended to include "only extreme cases of parental abuse or neglect." (In re James T. (1987) 190 Cal. App.3d 58, 65 [235 Cal. Rptr. 127].)
(7b) The mother contends that the evidence does not support any such extreme case here. She emphasizes that she never physically harmed Kristin, that her anger was never directed towards Kristin, that she had successfully protected Kristin from harm during years of harassment by the father, and that she had always provided for Kristin in terms of food, shelter, clothing and playthings.
The department does not dispute these assertions and the social worker readily agreed that the mother had not been physically abusive to Kristin and that the primary risk to her was "not in any physical way." Rather there was an emotional toll on Kristin due to her mother's inability to handle stress, *1657 her angry outbursts, her poor judgment and the neglect of her child resulting from the mother simply being overwhelmed by life's difficulties. But this type of detriment, the mother argues, is not what was contemplated by the statutory scheme of dependency law. She contends the court did not conduct the proper balancing of harm in this case, as described by the following passage in In re Jamie M., supra, 134 Cal. App.3d 530.
(5b) "Often the harm created by removing a child from its parents may be more serious than the harm which the state intervention seeks to prevent ... because the courts lack the ability to insure that the placement is superior to the child's own home.... The children may also be harmed by viewing the placement as punishment for some unknown thing they have done wrong....
"It cannot be presumed that a mother who is proven to be `[mentally ill]' will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less then [sic] socially acceptable and yet they are loving and compassionate parents. Conversely, there are parents who always exhibit socially acceptable behavior publicy [sic], but whose children have parent-induced psychological problems their entire lives. The trial court's duty in this situation is to examine the facts in detail. The social worker must demonstrate with specificity how the minor has been or will be harmed by the parents' mental illness.... The court must then weigh the evidence of the harm which will be caused the children if they remain in parental custody against the harm caused by placing the children in foster care. Only after this balancing has taken place, based on all the available evidence, can the court make an informed decision which can be said to be truly in the best interests of the children." (In re Jamie M, supra, 134 Cal. App.3d at pp. 541-542, fn. omitted.)
(7c) In Jamie M., the court reversed the dispositional order, finding "no evidence" that the mother's mental illness would adversely affect her children. (In re Jamie M, supra, 134 Cal. App.3d at p. 542.) That is not the case here. Here the court engaged in the appropriate weighing process and the record on the whole supports the dispositional order. There is substantial evidence that the mother is a substance abuser and that her use of drugs intensifies an unstable emotional condition. Both her suicide attempt in June of 1994 and the incident which resulted in Kristin's dependency involved drugs. In both cases Kristin was in her mother's custody and the mother made no particular effort to ensure that her daughter was safe. This constitutes child-endangering behavior.
Although the mother insists that these are isolated instances, the record shows that the mother is in denial about both her substance abuse and the *1658 importance of medical treatment of her mental problems. Since she will not acknowledge her responsibility in these matters and refuses to cooperate with professionals, there is little reason to believe that if Kristin were returned home, adding stress to the mother's already stressful life, the "downhill spiral" precipitating further episodes would not reoccur, placing Kristin in danger. In addition, the mother appears to be unable to avoid, and indeed often provokes, angry confrontations with other people while in the company of her daughter. In one instance she allowed Kristin to become the object of a tug-of-war between herself and the staff at Clover House, thus necessitating police intervention. Although it is apparent from the record in this case that mother and daughter are bonded, the evidence also supports the conclusion that the mother's emotional instability, substance abuse and combative behavior present a substantial risk of danger to her daughter, within the meaning of section 361, subdivision (b)(1). We will therefore affirm the dispositional orders.

THE HABEAS CORPUS PETITION
(8a) The mother has filed a petition for a writ of habeas corpus, arguing that the proceedings in juvenile court were fundamentally unfair because she was denied effective assistance of counsel. The gist of her argument is that her attorney failed to present favorable evidence regarding her mental state, in the form of testimony and a psychiatric evaluation performed by Dr. Charles DeLong. Dr. DeLong's evaluation indicated that the mother did not have personality disorders that required medication. This would have directly contradicted the evaluation presented by the department in this case. The mother argues that counsel's failure was clearly prejudicial because the evidence against her was otherwise unrebutted. Even so, the court apparently found the issues to be close, reviewing the record "more than once" and taking a month to reach a decision.
In support of the petition the mother submitted Dr. DeLong's report, a declaration from Dr. DeLong, and declarations from trial counsel, appellate counsel and the mother. We are also referred to a sealed portion of the record wherein Marsden proceedings were held in chambers. (People v. Marsden (1970) 2 Cal.3d 118 [84 Cal. Rptr. 156, 465 P.2d 44].)
In response, the department argues initially that we should not entertain the petition for two reasons: first the mother is estopped from asserting ineffective assistance because she had the opportunity at the Marsden-type hearing to inform the court of Dr. DeLong's report but failed to do so; and second, the petition, which was filed in January of 1996, seven months after the disposition orders, was too late.
*1659 In regard to the first point, we believe the record, as we explain below, indicates the mother did bring DeLong's report to the court's attention in chambers. However, neither the court nor her attorney responded to her remarks.
(9) As to the second point, a writ petition seeking extraordinary relief must be filed within a reasonable time. (In re Twighla T. (1992) 4 Cal. App.4th 799, 803 [5 Cal. Rptr.2d 752].) The record in this case was filed in August of 1995 and the opening brief was filed two months later, in October of 1995. At that time we granted permission to expand appointment of appellate counsel to include preparation and filing of a petition for writ of habeas corpus. Appellate counsel attributes the subsequent three-month delay in filing the petition to trial counsel's failure to provide the file and to furnish a declaration. We do not find that these circumstances justify dismissing the petition as untimely.

Right to Counsel Under Section 317.5
(10a) Turning to the merits, we confront the question of the nature of a parent's right to counsel in juvenile dependency proceedings. Although this question has engendered much conflicting law over the past two decades, the following propositions appear to be well settled. Under statutory law and court rule an indigent parent in a dependency proceeding has a right to appointed counsel where out-of-home placement is an issue. (§ 317, subd. (b); Cal. Rules of Court, rule 1412(h)(1)(B); In re Arturo A. (1992) 8 Cal. App.4th 229, 238 [10 Cal. Rptr.2d 131].) Section 317.5, added to the code effective January 1, 1995, now provides that "[a]ll parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." (Italics added.)
In addition to these statutory rights, an indigent parent may in some cases have a due process right to counsel where the termination of parental rights may result. (Lassiter v. Department of Social Services (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153] (hereafter, Lassiter); In re Arturo A., supra, 8 Cal. App.4th at p. 238.) Whether due process requires appointment of counsel in any given case will depend upon the weighing of private and governmental interests and the risk of an erroneous decision. (Lassiter, supra, at p. 28 [68 L.Ed.2d at p. 650]; Mathews v. Eldridge (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33-34, 96 S.Ct. 893].) A parent who has established a due process right to appointed counsel is entitled to effective assistance of counsel; otherwise "it will be a hollow right." (In re Christina P. (1985) 175 Cal. App.3d 115, 129 [220 Cal. Rptr. 525]; Adoption of Michael D. (1989) 209 Cal. App.3d. 122, 135 [256 Cal. Rptr. 884]. In re Arturo A., supra, 8 Cal. App.4th at p. 238.)
*1660 Case law is not settled, however, as to whether a parent with a statutory right to counsel is similarly entitled to effective assistance of counsel. Accordingly, we asked for further briefing on the question whether a parent entitled to counsel under section 317, and specifically to competent counsel under new section 317.5, can raise a claim of ineffective assistance of counsel. The department and counsel for the minor take the position that when the right to counsel is only statutory, a claim of ineffective assistance of counsel is simply not cognizable on appeal or by writ. (In re Ammanda G. (1986) 186 Cal. App.3d 1075, 1079 [231 Cal. Rptr. 372]; In re Mary S. (1986) 186 Cal. App.3d 414, 418-419 [230 Cal. Rptr. 726]; In re Malinda S., supra, 51 Cal.3d at pp. 384-385; In re Arturo A., supra, 8 Cal. App.4th at p. 238; In re Benjamin E. (1996) 44 Cal. App.4th 71 [51 Cal. Rptr.2d 584].)
We disagree. We do not believe the Legislature intended the right to competent counsel provided in sections 317 and 317.5 to be a "hollow right." Even prior to section 317.5, courts recognized claims based on violations of a statutory right to counsel. (In re David C. (1984) 152 Cal. App.3d 1189, 1206 [200 Cal. Rptr. 115] ["Certainly, as counsel was appointed for the indigent parents ... [they] had a right to have effective assistance of counsel."]; In re R.S. (1985) 167 Cal. App.3d 946 [213 Cal. Rptr. 690] [evaluating effectiveness of counsel where appointment required by statute]; In re Patricia E. (1985) 174 Cal. App.3d 1, 9 [219 Cal. Rptr. 783] ["The minor has a statutory right to appointment of counsel. That right necessarily entails a right to effective assistance of the counsel appointed"]; In re Nalani C. (1988) 199 Cal. App.3d 1017 [245 Cal. Rptr. 264] [reviewing violation of statutory right to counsel]; In re Ronald R. (1995) 37 Cal. App.4th 1186, 1193-1196 [44 Cal. Rptr.2d 22] [same].) The addition of section 317.5 only strengthens that right.
Courts which have taken the contrary view reason that dependency proceedings are civil in nature and that their primary purpose is not to prosecute the parent but to protect the child. (In re Michael S. (1981) 127 Cal. App.3d 348, 363-364 [179 Cal. Rptr. 546]; In re Mary S., supra, 186 Cal. App.3d 414.) Several assumptions underlie this reasoning: civil proceedings involve property rights, not personal liberties; appeal on grounds of ineffective assistance of counsel should be reserved for those cases involving fundamental interests; allowing claims of ineffective assistance of counsel will cause delay and consequently does not serve the best interests of the child.
These various assumptions bear examining, particularly in light of sweeping revisions to the statutory scheme governing dependencies in California. Prior to 1989, dependency proceedings under section 300 were entirely separate from actions which terminated parental rights under former Civil *1661 Code section 232. Thus courts referring to "dependency proceedings" or "section 300 proceedings" under the old statutes did not contemplate that the termination of parental rights was at issue. (See, e.g., In re Jacqueline H. (1978) 21 Cal.3d 170, 176 [145 Cal. Rptr. 548, 577 P.2d 683].) Effective January 1, 1989, the two proceedings have been combined. The entire dependency process is now governed by one statutory scheme, which begins with the filing of a petition under section 300 and may end with a selection and implementation hearing terminating parental rights under section 366.26. (Stats. 1987, ch. 1485, p. 5598.) Section 366.26 "cannot properly be understood except in the context of the entire dependency process of which it is [a] part." (Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 253 [19 Cal. Rptr.2d 698, 851 P.2d 1307].) Each stage of the proceedings is part of an "overall process" defining a "whole system of law." (In re Marilyn H. (1993) 5 Cal.4th 295, 307 [19 Cal. Rptr.2d 544, 851 P.2d 826].)
(11a) Under the new statutory scheme it is generally recognized that the important decisions affecting a parent's rights are made at the proceedings leading up to the hearing which ultimately may result in the termination of parental rights. (Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 253; In re Arturo A., supra, 8 Cal. App.4th 229.) "Practically speaking, once the state has become involved in the parent/child relationship through a section 300 dependency proceeding, there is a substantial possibility that the parent may lose custody of the child or be separated from the child for significant periods of time. Like termination proceedings, dependency proceedings may work a unique kind of deprivation. Indeed, they are frequently the first step on the road to permanent severance of parental ties. [Citations.] A parent who is unable to present an adequate defense from the outset may be seriously disadvantaged later." (In re Emilye A., supra, 9 Cal. App.4th at p. 1707.)
(10b) These changes in the law cast the assumptions formerly relied upon in a new light. While the parent in a modern day dependency proceeding may not stand in the same shoes as a criminal defendant facing a loss of personal liberty, nonetheless to say simply that dependency proceedings are civil in nature fails to acknowledge the fundamental difference between these proceedings and the ordinary civil action. (11b) Courts have long recognized that a "natural parent's desire for and right to the companionship, care, custody and management of his or her children is an interest far more precious than any property right." (In re Joyleaf W. (1984) 150 Cal. App.3d 865, 868 [198 Cal. Rptr. 114]; Lassiter, supra, 452 U.S. at pp. 27, 28 [68 L.Ed.2d at pp. 649-650].) Such an interest "undeniably warrants deference and, absent a powerful countervailing interest, protection." (Stanley v. Illinois (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208]; *1662 Lassiter, supra, 452 U.S. at p. 27 [68 L.Ed.2d at pp. 649-650].) "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." (Santosky v. Kramer (1982) 455 U.S. 745, 759 [71 L.Ed.2d 599, 610, 102 S.Ct. 1388].) Thus the parent's interest in termination proceedings is "a commanding one." (Lassiter, supra, at p. 27 [68 L.Ed.2d at p. 650].)
Although parents in dependency proceedings are not prosecuted as defendants, petitions often contain allegations of criminal activity. The proceedings are "adversarial in nature." (In re Emilye A., supra, 9 Cal. App.4th at p. 1709.) The governmental agency is represented by its own counsel and employs professional social workers who are empowered to investigate the family situation and to testify against the parent. Moreover, the possible end result of the process, namely the total and irrevocable severance of the parent-child relationship, has been acknowledged as a punitive sanction. (See, e.g., H.R.Rep. No. 95-1386, p. 22 (1978) accompanying the Indian Child Welfare Act of 1978, Pub.L. No. 95-608, 92 Stat. 3069 ["removal of a child from the parents is a penalty as great, if not greater, than a criminal penalty...."].)
California statutes and rules of court recognize the gravity of the possible deprivation involved in dependency proceedings and the importance of protecting the fundamental rights of parents and ensuring a fair and accurate adjudication. As the Supreme Court observed in Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 255, California dependency statutes strive to give parents a "more level playing field" by requiring appointment of counsel when out-of-home care is recommended and at all subsequent hearings. (§ 317, subds. (b) & (d).)
(10c) The Legislature has now clearly stated that "[a]ll parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." (§ 317.5, italics added.) There is nothing vague or ambiguous about this directive and we believe it must include the right to seek review of claims of incompetence of counsel. The choice of the word "competent" is particularly meaningful, as California case law defining the right to effective assistance of counsel uses this word in the test for determining adequacy of counsel. In People v. Pope (1979) 23 Cal.3d 412, 425 [152 Cal. Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], the Supreme Court held that a criminal appellant claiming ineffective assistance of counsel must show that "trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." The court again followed this standard in People v. Fosselman (1983) 33 Cal.3d 572, 581 [189 Cal. Rptr. 855, 659 P.2d 1144].
*1663 The conclusion that the statutory right to competent counsel carries with it the right to judicial review is entirely consistent with the legislative history of the bill enacting section 317.5. (Sen. Bill No. 783, (1994 Reg. Sess.) Stats. 1994, ch. 1073, § 1.) The last Assembly Committee on the Judiciary report for Senate Bill No. 783 stated that the purpose of the bill was to provide for competent counsel for all parties in dependency cases. The report pointed out that "except for a defendant in a criminal case, there is no specific statutory right to competency of counsel." By providing such a right, the statute was intended to address, among other issues, "the problem of a lack of any meaningful process whereby parents or dependent children can complain about their appointed counsel." (Assem. Com. on Judiciary Rep., Apr. 13, 1994, Sen. Bill No. 783.)
The department argues that section 317.5 must be understood by reference to section 317.6, which was enacted together with it as part of Senate Bill No. 783. Section 317.6 provides that on or before January 1, 1996, the Judicial Council is to adopt rules of court regarding the appointment of competent counsel in dependency proceedings, including rules regarding screening appointed counsel, establishing "minimum standards of experience and education necessary to qualify as competent counsel" (§ 317.6, subd. (a)(2)), and establishing "[p]rocedures for handling client complaints regarding attorney performance." (§ 317.6, subd. (a)(3).) In addition, each superior court is to establish local rules by July 1, 1996. (§ 317.6, subd. (b); see Cal. Rules of Court, rule 1438.)
(12) The department contends that the right to competent counsel provided in section 317.5 was meant to be defined by standards established pursuant to section 317.6, and that if counsel fails to meet these standards the remedy is the complaint process referred to in section 317.6, subdivision (a) (3). The obvious flaw in this argument is that the standards and complaint procedures are not yet in effect and are thus not available to a parent or child in the position of the mother in our case. We cannot accept the notion that the Legislature intended the right to competent counsel to be limited by standards and procedures to be established by local courts 18 months after the statute went into effect. Rather it appears to us that the rules of court and local rules are to be developed, after a sufficient time for research and consultation, to provide standards of minimum training and experience in order to guide the court in appointing competent attorneys to represent parties in dependency proceedings. Furthermore, we do not believe that a process established by local rule to resolve complaints about appointed counsel was intended to supplant a right to judicial review of a claim that counsel's incompetence infected the proceedings to such an extent that they were fundamentally unfair. Such a result serves neither the interests of the parties nor the state's interest in substantial justice.
*1664 (10d) Courts which have determined that a claim of ineffective assistance of counsel is not available in juvenile dependency cases have often used the rationale that the paramount concern is the child's welfare, and in particular the child's interest in the finality of the proceedings. This is undoubtedly a compelling consideration in those cases where parental rights have been terminated and the child has been placed for adoption, or where the decision on permanent placement will be unreasonably delayed, resulting in prolonged uncertainty for the child. (See, e.g., Adoption of Alexander S. (1988) 44 Cal.3d 857, 866 [245 Cal. Rptr. 1, 750 P.2d 778]; In re A.M. (1989) 216 Cal. App.3d 319 [264 Cal. Rptr. 666], In re Arturo A., supra, 8 Cal. App.4th at pp. 241-242; In re Issac J. (1992) 4 Cal. App.4th 525, 533-534 [6 Cal. Rptr.2d 65].) In such cases the point may have been reached "at which the interests of the child and parent collide, and at which the child's interest in finality prevails." (Id. at p. 532; In re A.M., supra, 216 Cal. App.3d at p. 322; Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 254.)
(13) While we certainly agree that the child's interests should be given great weight in a proceeding involving parental rights, it may not always be true, and we do not believe it is in this case, that preventing the parent from asserting a timely claim of ineffective assistance of counsel furthers the interests of the child. "If counsel's ineffective representation of the parent has resulted in an inappropriate termination of the parent-child relationship, the child may have an interest equal to that of the parent's in its restoration. Thus we believe ... that the denial of effective assistance at trial is an issue properly presented to a reviewing court." (In re Issac J., supra, 4 Cal. App.4th 525, 531; see also In re Emilye A., supra, 9 Cal. App.4th at p. 1707, fn. 9 ["Can it be said that it is in the best interest of a child to be taken from the accustomed custody and control of his or her parents when there has not been a fair hearing related to the need for such intervention?"]
The court in Emilye A., supra, also pointed out that cases which have decided a parent may not seek reversal on grounds of incompetence of counsel "ignore the fact that reversal of an order in a dependency proceeding does not necessarily mean that the status quo is reinstated and that the child can no longer be protected. A reversal because of ineffective assistance of counsel does not preclude further dependency proceedings in juvenile court; it simply requires that the proceedings be reconducted because the parents were not properly represented." (In re Emilye A., supra, 9 Cal. App.4th at p. 1707, fn. 9.)
When we examine case authority cited to us for the proposition that effective assistance of counsel cannot be raised in dependency proceedings where the right is only statutory, we find that those decisions were based on *1665 assumptions linked to a statutory scheme which is no longer viable. (In re Michael S., supra, 127 Cal. App.3d 348; In re Mary S., supra, 186 Cal. App.3d 414; In re Ammanda G., supra, 186 Cal. App.3d 1075.)
In re Michael S., supra, 127 Cal. App.3d 348, was one of the first in this line of cases. There the court stated, with scant analysis, that denial of effective assistance of counsel does not apply in dependency cases, because they are civil proceedings which concern themselves with protection of the child rather than "reproof and improvement of erring parents." (Id. at p. 364.)
The same year as In re Michael S., the United States Supreme Court made clear in Lassiter that a parent's right to the care and custody of his or her children is an important interest deserving of protection. However, California cases following Lassiter routinely applied its principles only to actions terminating parental rights under former Civil Code section 232, and not to section 300 proceedings. Interestingly, Lassiter itself may not compel such a restricted application. Although that case concerned a termination proceeding, the court observed that "[i]nformed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well." (Lassiter, supra, 452 U.S. at pp. 33-34 [68 L.Ed.2d at p. 654], italics added.)
In re Michael S. was relied upon by courts in In re Ammanda G., supra, 186 Cal. App.3d 1075 and In re Mary S., supra, 186 Cal. App.3d 414, both of which distinguished section 300 proceedings, perceived as civil in nature, from proceedings under former Civil Code section 232, where the prospect of termination of parental rights implicated due process. In re Mary S., which concerned not a right to counsel but a right to confront witnesses, expanded on this theme. There the court made the following observations: "Dependency proceedings are civil in nature, designed not to prosecute a parent, but to protect the child. [Citations.] A parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since `the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence' unlawfully seized. [Citations.] Nor can the parent seek reversal on the grounds of incompetency of counsel. (In re Michael S., supra, 127 Cal. App.3d at p. 364.) These decisions recognize the paramount concern is the child's welfare. [Citations.]" (In re Mary S., supra, 186 Cal. App.3d at pp. 418-419, fn. omitted.)
The court in Mary S. then applied these principles to the claimed right to confront a child witness in that case. Such a right was not absolute, the court *1666 concluded, particularly where it interfered with the child's welfare. The court acknowledged in a footnote that the parents' right not to be separated from their child entitled them to appointed counsel and in some cases rights similar to those of a criminal defendant. In this way the right to counsel was different from the right to confrontation of a child witness, because it presented no conflict with the child's right to be free of injury. (In re Mary S., supra, 186 Cal. App.3d at pp. 418-419, fn. 3.)
The discussion quoted above in In re Mary S. was adopted verbatim by the Supreme Court in its opinion in In re Malinda S., supra, 51 Cal.3d at page 384. Neither Malinda S. nor Mary S. specifically addressed the issue of the right to counsel. Moreover, Malinda S., like Michael S. and Mary S. before it, was decided under the former statutory scheme. Therefore, the court's observation that a parent cannot seek reversal of a dependency order on grounds of incompetence of counsel must again be interpreted with reference to statutes where dependency proceedings were entirely separate from, and did not result in, termination of parental rights. Indeed in In re James S. (1991) 227 Cal. App.3d 930 [278 Cal. Rptr. 295], the court distinguished Malinda S. on that basis, finding that since Malinda S. concerned a juvenile dependency proceeding under section 300, the comments of the court regarding right to counsel did not apply to a proceeding to terminate parental rights.
The year following In re James S., the court in In re Arturo A., supra, 8 Cal. App.4th 229, reviewed the state of the law and, relying upon Mary S. and Malinda S., concluded that reversal based on ineffective assistance of counsel is not available in dependency proceedings when the right to counsel is only statutory and not constitutionally based. The court reasoned that under the dependency law as it existed prior to 1989, termination of parental status was not an issue and therefore due process rights were not implicated. The court presumed that under the new statutory scheme the question whether due process rights attach would depend upon whether the particular hearing could "directly threaten permanent separation of child from parent." (In re Arturo A., supra, 8 Cal. App.4th at p. 239.) While Malinda S. appeared to suggest such a rule, the court acknowledged that Malinda S. did not deal with the new law.
We do not believe the prediction of the court in Arturo has proven to be a workable standard. Indeed several years later the same court which had written Arturo characterized its earlier remarks as dicta and emphasized that due process does not depend upon the particular stage of the proceedings but on a case by case analysis under Lassiter. (In re Angelica V. (1995) 39 Cal. App.4th 1007, 1013, fn. 3 [46 Cal. Rptr.2d 295].)
*1667 The court in Arturo A. also noted "some doubt remain[ed]" about the proposition that when a right to counsel is only statutory it does not include the right to competent assistance of counsel. (In re Arturo A., supra, 8 Cal. App.4th at p. 238.) Whatever doubt remained in 1992, however, was put to rest in 1994 with the enactment of section 317.5, providing a specific right to competent counsel in dependency proceedings when counsel is appointed.
The department and counsel for the minor seek support in the recent case of In re Benjamin E., supra, 44 Cal. App.4th 71. There the court made the observation that "section 300 ... proceedings ... do not undertake to terminate parental [rights]." Therefore, these proceedings "do not give rise to a right to counsel on due process grounds." (Id. at p. 75.) Since the right to counsel is only statutory, the court reasoned, a parent in a dependency proceeding cannot raise a claim of ineffective assistance of counsel.
The issue before the court in Benjamin E., however, was whether Wende review (People v. Wende (1979) 25 Cal.3d 436 [158 Cal. Rptr. 839, 600 P.2d 1071]) is available in dependency appeals. Benjamin did not discuss, or even mention, section 317.5. In our view, moreover, the court's statements do not acknowledge that dependency proceedings "are frequently the first step on the road to permanent severance of parental ties." (In re Emilye A., supra, 9 Cal. App.4th at p. 1707.) Furthermore, the court in Benjamin E. relied on the authority of In re Michael S., In re Mary S., and In re Ammanda G., cases decided under the former statutory scheme.
We conclude that the mother's statutory right to competent counsel entitles her to raise a claim here that the proceedings below violated this right. We have also concluded that the petition in this case was timely, although we acknowledge that untimeliness may in many cases preclude review of claims of ineffective assistance of counsel. (See, e.g., In re Issac J., supra, 4 Cal. App.4th at p. 534; In re Twighla T., supra, 4 Cal. App.4th at p. 803.) Nowhere is timeliness more important than in a dependency proceeding where a delay of months may seem like "forever" to a young child. (In re Micah S. (1988) 198 Cal. App.3d 557, 566 [243 Cal. Rptr. 756] (conc. opn. of Brauer, J.).)[2] We therefore agree with In re Arturo A. that claims of error based on ineffective assistance of counsel at a referral hearing must comply with the requirements of section 366.26, subdivision (k).
(14) Before proceeding to the merits, we will address the question of the applicable standard of review. A parent seeking review of a claimed violation of section 317.5 must show a violation of the statute, i.e., that counsel *1668 failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law. Courts are not unfamiliar with this test. (People v. Pope, supra, 23 Cal.3d at p. 425; People v. Fosselman, supra, 33 Cal.3d at p. 581; People v. Humphries (1986) 185 Cal. App.3d 1315, 1341 [230 Cal. Rptr. 536].)
The parent must also establish that the claimed error was prejudicial. We agree with those cases holding that violation of a statutory right to counsel is properly reviewed under the harmless error test enunciated in People v. Watson, supra, 46 Cal.2d 818, 836. (In re Justin L. (1987) 188 Cal. App.3d 1068, 1077 [233 Cal. Rptr. 632] [concerning statutory right to self-representation]; In re Nalani C., supra, 199 Cal. App.3d 1017; In re Ronald R., supra, 37 Cal. App.4th 1186; In re Malcolm D. (1996) 42 Cal. App.4th 904, 919 [50 Cal. Rptr.2d 148].) Thus the parent must demonstrate that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (People v. Watson, supra, 46 Cal.2d at p. 836.)
(8b) To put the mother's claim in perspective, we note that on March 24, 1995, following two disruptive visits at Clover House, the court suspended visitation until the mother had submitted to a psychological evaluation to assess her need for medication. The court ordered her to cooperate with the evaluator and to obtain a statement regarding her medication needs. At the hearing on March 24, 1995, the mother agreed to cooperate with the court-ordered evaluation, expressed her desire not to take medication and in addition indicated that she intended to pursue an independent evaluation, informing the court: "We have been recommended a very good person at Stanford."
According to the mother's declaration, her father had agreed to pay for all expenses of testing and evaluating her by an independent psychiatrist from Stanford University. Near the beginning of April, the mother informed her trial counsel of this and he encouraged her to make the arrangements as soon as possible as this would be helpful in presenting her case. On April 26, 1995, she again called trial counsel and advised him that she had an appointment the following day with the psychiatrist from Stanford.
Dr. Charles DeLong's declaration states that he is a psychotherapist and a psychiatrist and is on the forensic panel of the Superior Court of Santa Clara County. He interviewed the mother on April 27, 1995, and on two subsequent occasions. Approximately a week before the continued jurisdictional and dispositional hearing scheduled for May 11, 1995, the mother informed trial counsel that the psychiatrist she had seen at Stanford was preparing a *1669 report in her behalf. Dr. DeLong's report was dated May 9, 1995. According to the mother, she delivered it to trial counsel as soon as it was completed. Counsel agrees he received it "shortly after it was prepared."
Dr. DeLong's report states that he interviewed the mother three times. She "demonstrated a good deal of anger, apparent tendency to project blame, and an obvious agitation as she talked about the loss of her daughter...." At no time during any of the visits, however, did she show "any kind of thought disorder, paranoia, affective disturbance, etc." He observed that the mother demanded a great deal of herself, and that she felt she must be strong and "vigorously oppose the world if it attempts to make inroads upon her integrity." She appeared to have much conflict with society, with men and with her parents, but did not appear to have significant conflict with her daughter. She had high standards in the care of her daughter and acknowledged that she needed to be "spelled from time to time."
Dr. DeLong concluded with a diagnosis of "Adjustment Disorder with Anxious Mood secondary to separation from child." He did not believe the mother required medication for this. While she had an "abrasive way of clobbering people with the truth" he felt this was a "minor characterological problem." He believed her outrage about the loss of her daughter was appropriate but acknowledged that "she may not handle her outrage very well and this may be, to a certain extent, producing a catch-22, for example, her daughter is taken, she gets angry, then it's pointed out to her that she's too angry to care for her daughter!"
In his declaration, Dr. DeLong reiterated his opinion that the mother did not have a borderline personality disorder, nor did she have any major depression. In sum, "[s]he has no psychosis which would interfere with her ability to parent her child." Furthermore, he did not believe the mother "needs to be on any type of medication." He stated that he had reviewed Dr. Seeman's report, the underlying petition, and the reports of the department in this case. He saw very little evidence to support the petition and believed the mother had been "grossly misunderstood" by the department. He stated that he was available to testify on behalf of the mother but that the mother's attorney never contacted him to ask him to testify or to discuss his evaluation of the mother.
The mother's trial counsel states in his declaration that he did not know of the psychiatric evaluation performed by Dr. DeLong until after the mother had seen Dr. DeLong. It appears he received a copy of Dr. DeLong's report at least by May 11, 1995, the day of the continued jurisdiction and disposition hearing. On that day, in the middle of the mother's testimony, a brief *1670 conference was held in chambers. The mother expressed her concern that her interests and her daughter's interests were not being represented in the proceedings. Among other things, she complained that the court-ordered evaluation was submitted without objection whereas her independent evaluation, which contradicted it, had not been mentioned. She explained: "I went to a man at Stanford. I went to him three times. He's very bright, he is on the hospital staff, and he's on the faculty, and he has just been able to provide information contradictory to the court ordered evaluation, and I'm concerned that I'm not  my daughter's interests are not being represented by [counsel for the minor], because  because my daughter needs me. She does not need this system keeping her from me. And I need somebody who will only let the facts come out and not the slander, not the hearsay, and [mother's trial counsel] seem to not. And when other people are doing  I have had seven or eight months now of listening to other people slander, make allegations, and these things are mostly not true or very distorted, and I'm very concerned that I'm not getting proper representation and that my daughter's interests are not being represented...."
The court told the mother that she had a very good attorney who had been practicing for 20 years and who was well trained and competent. The in camera proceedings concluded and trial resumed.
Although trial counsel used Dr. DeLong's report in cross-examining Mr. Gammino, he did not attempt to submit the report and did not call Dr. DeLong as a witness. In fact he did not contact DeLong at any time after receiving his report. Counsel offers the following explanation: "I felt he presented nothing helpful to her. I believed that Dr. DeLong had only seen petitioner twice, and that he was not treating her. I also believed the report would not be admissible because the cut-off for the discovery disclosure time had passed."
As the mother informed both the court and her attorney, Dr. DeLong had interviewed her three times. Although he was not treating her on a regular basis, neither was Dr. Seeman, who had seen her only twice, and whose report the department relied on exclusively. Since counsel did not contact Dr. DeLong, counsel had no reason to believe that DeLong had not reviewed the file. Dr. DeLong's declaration states in fact that he reviewed Dr. Seeman's report, the petition and the reports of the department.
Furthermore, it is difficult to understand why counsel concluded that Dr. DeLong's report would not help the mother. Other than her own testimony and that of her boyfriend, Dr. DeLong's evidence was the only evidence *1671 favorable to her. A critical issue at these hearings was whether or not the mother should be taking medication, and her visitation had been suspended until this issue was resolved. The department's evaluator had stated that the mother's care of her child might be "problematic" without the help of medication and the court relied on this opinion in ordering that Kristin not be returned to the mother. The court did not have the benefit of Dr. DeLong's opinion that the mother did not "need[] to be on any type of medication."
The department, in response to the mother's writ petition, characterizes Dr. DeLong's report as that of an "advocate bamboozled by [the mother]," and argues that counsel could have reasonably concluded that this "one-sided approach" would not be helpful. Dr. DeLong is a medical doctor, a psychotherapist and psychiatrist, a member of the forensic panel of the Superior Court of Santa Clara County and affiliated with a highly prestigious university. Had the mother's trial counsel interviewed Dr. DeLong and determined he was not a credible witness, that would be a different matter. Here, however, counsel made no such assertion and in fact concedes he never contacted DeLong.
Finally, counsel's explanation that he thought the evidence would be inadmissible because the cutoff date for discovery disclosure had passed is not supported by the record. It shows that counsel received the report, dated May 9, 1995, on the first day of trial, May 11, 1995. Michael Gammino's report, submitted by counsel for the minor, was dated May 18, 1995, and was received in evidence on that date. The mother's attorney stipulated to that report coming into evidence, and yet made no request for DeLong's report, submitted the previous week, to be similarly admitted. The record does not indicate there was any cutoff date for discovery. Counsel contends as a last argument that he had no opportunity to evaluate the report. However, there is no explanation why he made no attempt to do this or to contact Dr. DeLong during the week between May 11 and May 18.
In sum, the record, including evidence attached to the writ petition, reveals no practical or tactical reason why Dr. DeLong's evidence was not brought to the court's attention. At the very least counsel should have contacted and interviewed Dr. DeLong after receiving a report which was highly favorable to his client. We conclude therefore that the mother's petition has made the requisite showing that her attorney failed to act "in a manner to be expected of [a] reasonably competent attorney[] acting as [a] diligent advocate[]." (People v. Pope, supra, 23 Cal.3d at p. 425.)
Under the second prong of the test, the mother must show prejudice, i.e., whether it is reasonably probable that a different result would have obtained *1672 in the absence of counsel's alleged incompetence. (People v. Watson, supra, 46 Cal.2d at p. 836.) Here we also conclude that the mother has made a prima facie showing. Dr. DeLong's evidence was the only expert evidence on behalf of the mother. It was evidence by a professional with reputable credentials who disputed the findings made by the department's expert. Without this evidence the mother's defense was virtually nonexistent.
The court's disposition rested largely on the one psychological evaluation of Dr. Seeman, and the fact that the mother was not following a plan of medication. The statement of decision indicated that the court considered this case closely, taking a month to reach a decision after reviewing the record several times. We can only speculate as to what would have happened in the proceedings below had the court had before it Dr. DeLong's evaluation, which presented the mother in a more favorable light, rejected the notion that she required medication and strongly recommended that the child be returned to her custody.
The determination of prejudice in this case is most appropriately addressed in the trial court. (See, e.g., In re Arturo A., supra, 8 Cal. App.4th at p. 245.) We will therefore issue an order to show cause, returnable in the trial court, as provided below.
Although the parties have engaged in a lengthy analysis of the right to effective assistance of counsel under constitutional principles of due process and fundamental fairness, our conclusion regarding the statutory right to competent counsel disposes of the mother's claim. (15) It is a well-established principle of judicial review that "... we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (People v. Williams (1976) 16 Cal.3d 663, 667 [128 Cal. Rptr. 888, 547 P.2d 1000].)

DISPOSITION
As to the appeal (H014212), the orders appealed from are affirmed.
As to the petition for a writ of habeas corpus (H014894), we issue herewith an order to show cause returnable in the superior court, before the commissioner who presided over these proceedings or before such other commissioner or judge as the presiding judge shall designate, at a time and date specified by the presiding judge, directing the department and the minor to show cause why the relief sought by the petition should not be granted. *1673 The department and minor shall file a written return to this order and the petitioner shall then file a traverse thereto. Based upon these formal pleadings the court must determine whether an evidentiary hearing is needed and if so identify the issues to be decided. (People v. Romero (1994) 8 Cal.4th 728, 738-740 [35 Cal. Rptr.2d 270, 883 P.2d 388].) The court shall then conduct an evidentiary hearing, if necessary, make findings and grant or deny appropriate relief.
Cottle, P.J., and Mihara, J., concurred.
Appellant's petition for review by the Supreme Court was denied September 25, 1996.
NOTES
[1] All further statutory references, unless otherwise noted, will be to the Welfare and Institutions Code.
[2] In the usual case, the resulting harm will be that the child's permanent placement is delayed. In this case, however, the harm to Kristin may be that her return home was delayed. Counsel has informed us that on February 1, 1996, the court ordered Kristin returned to her mother.