Filed 3/10/14  In re William F. CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re WILLIAM F. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, Plaintiff and Respondent, v. RICHARD F., Defendant and Appellant. | F067834 (Super. Ct. Nos. 516690 & 516691) **O P I N I O N** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Gomes, J., and Peña, J.

Richard F. (father) appeals from the juvenile court's dispositional order removing his sons, William and Alfred, seven and four years old respectively, from his custody. He contends reasonable efforts were not made to prevent the children's removal. Therefore, he further contends, the juvenile court erred and its removal order must be reversed. We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

Father and his wife, M.H. (mother), are the parents of William and Alfred, the subjects of this appeal. Father and mother also have three adult daughters and a ten-year-old daughter, Emily.

Mother has a history of drug use. In 2006, she tested positive for amphetamines while delivering William. William tested negative. Mother admitted using drugs during her pregnancy and father admitted to having been involuntarily committed in 2006. He was diagnosed with adjustment disorder and personality disorder but not prescribed medication. They participated in six months of voluntary family maintenance services during which mother completed alcohol and drug treatment. Their case was closed in November 2006.

In 2009, while pregnant with Alfred, mother was admitted to the hospital because her "water ruptured" and remained there until Alfred was born. She tested positive for marijuana and admitted to using it daily. She also used Oxycontin during the pregnancy until the third trimester when she switched to methadone.

These dependency proceedings were initiated in June 2013 after Officer R. Cuellar was dispatched to father and mother's house to investigate a report that a male minor was in front of the house naked and that his brother who was autistic was running down the street. Officer Cuellar found four-year-old Alfred naked standing in front of the garage door. Alfred ran to the front door but could not open it. Cuellar opened the unlocked door and Alfred ran in. Mother was asleep on the couch. Cuellar woke mother up and

2

told her William was missing. She said William was autistic. While other officers searched for William, Cuellar looked through the home. He observed human feces and rotten food in every room and razor blades and broken glass in the bathtub. He also noted human and dog feces along with a rotten egg on the bed where the children played. There was also a pornographic magazine found in the bathroom in an open drawer within reach of the children.

Mother told Cuellar the house had been in that condition for a month. She also told Cuellar that she had a babysitter, "Tayana," who left but was supposed to return. She could not provide "Tayana's" address and telephone number. During the conversation, William was located two streets over and returned home.

Mother also told Cuellar that she was diagnosed with extreme anxiety and depression. She said she had not been taking her medication for a year and was self-medicating with alcohol and marijuana. She was also taking a non-addictive pain medication for a shoulder injury.

Father arrived and confirmed that the house had been in that condition for approximately a month. He said neither he nor mother was employed and he had been gone for three days looking for a job. He said he and mother were having financial and marital problems and did not have the time to clean the house.

Cuellar contacted the Stanislaus County Community Services Agency (agency) and emergency response social worker Monica Medeiros responded. Father told Medeiros mother attempted suicide in 2012, was suffering from depression, but not taking medication for it. He also said she drank one to five high gravity beers each day. Mother said she smoked marijuana and drank two "tall cans" of beer every day. She said she last used methamphetamine a year before. Father denied any drug use. Mother, however, suspected he was using methamphetamine. Cuellar told Medeiros the police had responded to the home five times in 2013 for domestic disputes.

3

Father and mother told Medeiros William was diagnosed with autism when he was three, but the family had not been able to obtain services for him.

Medeiros took William and Alfred into protective custody and Cuellar arrested mother and father for child cruelty. At the time, Emily was spending the summer with family friends. The agency placed William and Alfred together in foster care.

The juvenile court ordered William and Alfred detained pursuant to a first amended petition filed by the agency[1] and set a combined jurisdictional/dispositional hearing (the hearing) for July 2013. Social worker Sarah Hernandez provided father and mother referrals for a clinical assessment and parenting classes through Sierra Vista Child and Family Services, as well as individual counseling for mother. In addition, she referred them for a medication evaluation and an alcohol and drug assessment through Behavioral Health Services.

In its report for the hearing, the agency provided more detail about the family's background and circumstances. Father was 44 years old and worked for 25 years in the heating and air conditioning business. In February 2012, he and the family moved to California after his employment in Alaska ended. He had been unemployed since, but was actively seeking employment. He said the family had endured difficult times and he acknowledged having a mental breakdown in the past and having to be admitted to the hospital. However, he said he was released shortly after admission and was not prescribed medication. He said he participated in parenting classes and drug testing and completed a drug and alcohol assessment as part of the voluntary maintenance services plan. However, he did not require treatment. He said he last used methamphetamine when he was 22, alcohol when he was 25 and marijuana when he was 35. He did not see any harm in mother smoking marijuana and her use did not influence him. He also said

---

[1] The agency filed a dependency petition as to Emily but did not detain her. The juvenile court ultimately dismissed the petition.

they had tried to get help by applying for couples counseling, individual counseling and counseling for William's anxiety. They also tried to obtain services for William through Valley Mountain Regional Center but had not received a response. They erected an eight and a half foot fence to keep William safe and put a chime on the door to alert them if he went outside. He felt the family was "caught at the wrong time."

Mother, 44 years old, received treatment while in Alaska for acute anxiety and depression including anti-depressants and weekly therapy. She did not like taking medication and stopped. She has a "degenerative disc in her neck" and suffered whiplash in 2000 as the result of a head-on collision. She takes non-narcotic pain medication and is under a doctor's care. She has physical limitations which prevent her from doing laundry and mopping. She smokes marijuana occasionally for pain and has one or two beers every now and then. She used methamphetamine when William was born because she was under stress. She previously completed voluntary maintenance services and no longer used methamphetamine. She said it had been a rough year and she could not cope with father not working. She believed they needed couples counseling to help them communicate better and that father needed anger management. She said he occasionally pushed her around and cornered her which made her uncomfortable. She said she was not alone when she fell asleep. "Jill" was also there and mother was asleep maybe 20 minutes. She assumed complete responsibility for the charges, but said she did not do it deliberately. She said there was nothing rotten on the floor ─ she "just had not swept up yet."

The agency also reported William and Alfred had to be removed from their initial foster care placement after one day because of William's behavior. His caregivers reported that he was affectionate and loving but was "a lot of work." He loved to "climb all over the place and was very active." He was also anxious and picked at his skin or at objects near him when he was not engaged in an activity. Alfred was also reportedly

5

loving, but exhibited sexualized behavior with other foster children, including William. Approximately two weeks into their second placement, the caregivers gave the agency a seven-day notice to remove the boys. As of the report, the boys were in a foster care home in Sacramento.

The agency recommended that the juvenile court exercise its dependency jurisdiction and provide father and mother reunification services. The agency's concern was that father and mother minimized their alcohol and drug use, domestic violence and mental instability and the chaotic and unsafe environment it created for the children. The services plan recommended by the agency included mental health services for the whole family, parenting education and substance abuse treatment for father and mother, and a regional center assessment for William. The agency also recommended that father and mother attend a parenting class at a regional center to address the issues of parenting an autistic child.

The hearing originally scheduled for July 2013 was continued until August and set as a contested hearing. Meanwhile, the agency filed an addendum report advising the juvenile court that William and Alfred were in separate foster homes because the agency had not been able to find one caregiver willing to take them both. The agency considered the placements concurrent homes for the children, but advised the court it would continue its efforts to place the brothers together.

The agency also reported father and mother completed assessments at Sierra Vista and were referred for a clinical assessment and parenting classes. Mother was also referred for individual counseling. Father and mother scheduled but did not keep two appointments for an alcohol and drug assessment. In addition, mother appeared to be under the influence of some substance during a visit with the children in early August, as she was reportedly "jittery" and "lethargic." They were asked to drug test but declined on the advice of their criminal attorney. Because of father and mother's unwillingness to

6

be assessed for substance abuse and to drug test, the agency said it had not been able to consider voluntary family maintenance services nor had it scheduled a home assessment for safety hazards.

In August 2013, at the contested hearing, mother testified she had not been assessed for substance abuse and was not participating in parenting classes or counseling. She did not believe she then suffered from depression or anxiety nor needed medication. She denied having any concerns about father's anger or her safety. She denied being under the influence of a drug or alcohol during the August visit and denied exhibiting any of the reported behavior.

Mother further testified she and father were living with his mother and brother. Asked whether she had put a plan in place to keep her current residence clean, mother could only say she was "working" on a plan. She said there were locks on all the doors and locked gates in the backyard to keep William safe. Mother took pictures of the home in which she was living and the juvenile court received them into evidence.

Sarah Hernandez testified she knew father and mother moved to a different home. However, she had not assessed the home to determine its suitability for placing the children there. In order for the home to be approved, the other inhabitants had to be live scanned and had not been. In addition, Hernandez was waiting for the results of father and mother's drug and alcohol assessments before she assessed the home. She conceded they did not have to complete a drug and alcohol assessment or submit to random drug testing prior to the hearing. However, she did not believe the safety of the home could be assessed until concerns about father and mother's drug use could be allayed. She was also concerned about domestic violence in front of the children, mother's mental state and the lack of supervision. Her concerns for the family, she said, were more than the dirty house.

Following testimony, the juvenile court amended the petition and heard argument. The court found the first amended petition true as modified, ordered William and Alfred removed from father and mother's custody, and found there were no reasonable means to protect the children without removing them. The court ordered reunification services as proposed by the agency and set a six-month review of services for January 2014. This appeal ensued.[2]

## DISCUSSION

Father contends the juvenile court erred in ordering William and Alfred removed from his custody. We disagree. In order to remove a child from parental custody, the juvenile court must find by clear and convincing evidence, as relevant here, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's ... physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).)

Father does not dispute that William and Alfred were exposed to a substantial risk of danger in his custody. Instead, he argues, there were reasonable means to protect them from that danger without removing them. Specifically, he points out that their new home is clean and free of clutter as evidenced by the pictures introduced at the hearing. Further, he contends the agency could have protected the children in the home by offering the family in-home services, respite care, and family counseling through the regional center.

We review the juvenile court's dispositional order removing a child from parental custody for substantial evidence, bearing in mind that clear and convincing evidence

---

[2]     Mother did not appeal.

8

requires a heightened burden of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Having reviewed the record, we conclude substantial evidence supports the juvenile court's removal order.

William and Alfred were initially removed from father's custody because they were unsupervised and endangered and because the home was hazardous and filthy. If the lack of supervision had been an isolated incident and the condition of the home had improved by the dispositional hearing, the juvenile court would have more than likely returned the children to father's custody. However, this was, as Ms. Hernandez testified, more than a case of a dirty home. Rather, there was evidence suggesting ongoing substance abuse, domestic violence and mental instability.

The question then is whether substantial evidence supports the juvenile court's finding there were no alternatives to removal including the provision of in-home services. We conclude that it does. First, there was no reason to believe father and mother would have participated in services. They had the opportunity to do so but were unwilling. Beyond their unwillingness, however, there is a far more compelling reason in our view why in-home services were not an alternative in this case. Mother and father were under tremendous financial and emotional stress which they were trying to overcome without adequate coping skills. At the same time, they had two children who required close and constant supervision. As a result, the family's needs were great and the problems were not going to be resolved quickly. In the meantime, the possibility the children could be left unsupervised remained and the consequences were dire. As the juvenile court noted, the children could have been killed while mother slept. Under the unique circumstances of this family, in-home services were not sufficient to guarantee William and Alfred's protection in the home and were not an alternative to their removal.

We find no error on this record.

## DISPOSITION

The juvenile court's dispositional order issued on August 8, 2013, removing William and Alfred from father's custody is affirmed.