199 Cal.App.3d 1017 (1988)
245 Cal. Rptr. 264
In re NALANI C. et al., Minors.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Petitioner and Respondent,
v.
JACQUELINE M., Objector and Appellant.
Docket No. D004832.
Court of Appeals of California, Fourth District, Division One.
March 24, 1988.
*1020 COUNSEL
Sharron Voorhees, under appointment by the Court of Appeal, for Objector and Appellant.
Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Barbara Baird, Deputy County Counsel, for Petitioner and Respondent.
OPINION
TODD, J.
Jacqueline M. appeals from a judgment declaring her daughters, Nalani C. and Autumn C., free from her custody and control pursuant to Civil Code[1] section 232. After granting several continuances to allow Jacqueline and her court-appointed attorney to meet, the trial court relieved counsel on the morning of the trial when Jacqueline failed to appear. Trial proceeded in Jacqueline's absence and without counsel on her behalf. Jacqueline's principal assignment of error is that it was improper to hold the trial in her absence and without counsel. Fully cognizant of the principle that the children's best interest must be paramount in this type of proceeding,[2] we determine, under the circumstances of this case, that the proper procedure would have been to conduct the trial with the attorney remaining to represent Jacqueline's interests. However, since our review of the entire record shows (1) there is no evidence of error in the proceedings in the absence of counsel and (2) sufficient evidence supported the judgment, we affirm.

FACTS
Since Jacqueline raises a substantial evidence argument, we will recite the evidence in some detail.
In August 1982, when Nalani was two and one-half years old and Autumn was six months old, the children were made dependents of the juvenile court. The previous month, police had placed the children in protective custody after responding to a report of a disturbance in the home. The police found (1) the home to be extremely unsanitary and (2) dangerous items within easy reach of the children. Both children were bruised and *1021 dirty; Nalani had sores on her back. A neighbor said Nalani sometimes was left to wander alone in the street. The girls' presumed father, Richard C., was living in the home; Jacqueline had moved out of the home two months earlier and her whereabouts were unknown. The children were placed with Richard and his girlfriend, and Richard was instructed to attend parenting classes. In September 1982, there were three additional referrals to the department of social services: (1) University Hospital reported Richard was not giving Nalani medicine for her strep throat; (2) the American Indian Clinic reported Richard failed to return Nalani for a followup on a TB test and Nalani was extremely dirty and had a vaginal irritation that suggested possible molestation, and (3) Richard's girlfriend reported he had chased her and her child out of the house at knife-point. The girlfriend also said Richard constantly beat Nalani if she cried and he "shot up seven or eight times a day." In October 1982, Jacqueline was located and was considering reconciliation with Richard. She agreed to attend a drug rehabilitation program with Richard. The juvenile court hearing was continued so the parents could undergo psychological evaluation. They missed five appointments, but the evaluations  which showed both parents so self-absorbed and involved in drug use that they could not focus on their children's needs  were completed in December 1982. The evaluation on Jacqueline also indicated she was very immature and almost totally incapable of coping with life. At the time she was severely depressed and considered a suicide risk. The evaluation also indicated she might be a borderline schizophrenic, who occasionally passed over the line, then returned to more normal functioning. Also in December 1982, the children were placed in foster care.
In 1983, the parents' drug rehabilitation counselor discontinued therapy after three months because he believed they were not motivated to change. Also in 1983, the children's social worker reported the parents were visiting infrequently and were difficult to work with because they cancelled appointments and did not respond to messages. In 1984, the parents made progress in their reunification plan for a while. But in April 1984, Nalani's vagina was irritated and she told police: "My daddy hurt my pee-pee." Visitation was temporarily suspended until May 21, 1984. The parents visited the children regularly during August 1984, but not at all between August 30, 1984, and February 6, 1985. Meanwhile, the parents had reverted to their drug-dominated lifestyle. Jacqueline gave birth to Rose on September 23, 1984; Jacqueline tested positive for amphetamines, although the baby was free of any symptoms. An October 1984 permanency planning hearing resulted in a referral for a section 232 petition. The petition  which alleged abandonment (§ 232, subd. (a)(1)), cruelty and/or neglect (§ 232, subd. (a)(2)), disability caused by habitual use of alcohol or controlled substances (§ 232, subd. (a)(3)), and out-of-home placement for one year with a return to parents deemed to be detrimental (§ 232, subd. (a)(7))  was filed on *1022 January 4, 1985. A probation officer interviewed both parents on February 23, 1985. They said they had been drug-free for three and one-half months, but when confronted with Richard's drug possession arrest on January 3, 1985, they changed their story to say they had been drug-free since January 3. Authorities took baby Rose into custody on March 3, 1985, after friends of the parents brought the baby to the hospital with a fever. Jacqueline had left the home again, but she called Hillcrest Receiving Home the next day to inquire about Rose. She refused to reveal her own whereabouts. At a detention hearing on March 11, 1985, she admitted to an adoptions worker that she was using drugs again. She did not appear at a hearing on Rose's dependency case on March 20, 1985, when a true finding was made. On May 16, 1985, Jacqueline telephoned the social worker on Rose's case. She demanded to know the address of the foster home and threatened legal action, but refused to disclose her own whereabouts. Jacqueline telephoned this social worker again on July 18, 1985, demanding to see Rose immediately. When told this was not possible, Jacqueline said: "As soon as I know where she is, I'll kidnap her." She then slammed down the telephone. With respect to this proceeding concerning Nalani and Autumn, after several continuances  most of which were granted because Jacqueline and her court-appointed attorney had no contact with each other  the attorney was relieved as counsel on his motion. Trial on the section 232 petition started on August 30, 1985, in the absence of Jacqueline, who was not represented by counsel. Richard and his counsel were present. On September 11, 1985, the trial court found the allegations of section 232, subdivisions (a)(3) and (a)(7), had been proven by clear and convincing evidence regarding Jacqueline, and ordered Nalani and Autumn declared free from the custody and control of Jacqueline.[3]

DISCUSSION

I
Jacqueline contends the evidence was insufficient to sustain the judgment. (1) The standard for review is the substantial evidence test. (In re Lynna B. (1979) 92 Cal. App.3d 682, 701 [155 Cal. Rptr. 256].) In In re Angelia P. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637, 623 P.2d 198], our Supreme Court recited the test: "`[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence  that is, evidence which is reasonable, credible, and of solid value  such that a reasonable trier of fact *1023 could find [that termination of parental rights is appropriate based on clear and convincing evidence].'" (Quoting People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal. Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; citations omitted.)
Here, the trial court granted judgment pursuant to section 232, subdivisions (a)(3)[4] and (a)(7).[5] If there is substantial evidence to support either finding, the judgment terminating Jacqueline's parental rights is sustainable. (In re Heidi T. (1978) 87 Cal. App.3d 864, 873 [151 Cal. Rptr. 263].)
(2a) The record demonstrates substantial evidence supports the trial court's finding with respect to section 232, subdivision (a)(3). The trial court found overwhelming evidence that Jacqueline was "a long-time drug user" for whom it would be impossible to care for her children. Jacqueline started using amphetamines in 1979 at age 18 and she told the probation officer the longest she had ever been "clean" was six months. She had amphetamines in her system in 1980 when she delivered a still-born infant and in September 1984 when Rose was born. In March 1985, Jacqueline admitted she was still using "speed." Subsequently, she threatened Rose's social worker and threatened to kidnap Rose. Also, Dr. James Ghazil, a drug rehabilitation counselor who worked with Richard and Jacqueline between 1982 and 1984, expressed doubt that either of them could overcome his or her drug problem.
The record also demonstrates substantial evidence supports the trial court's finding with respect to section 232, subdivision (a)(7). The trial court found that return of the children to Jacqueline would be detrimental to them and that there was no less drastic alternative to terminating the *1024 parental relationship. The court also determined that the department of social services had attempted over the years to provide Jacqueline with services designed to overcome her problems, but Jacqueline did not avail herself of those services.
Jacqueline attacks the adequacy of the probation report, contending it (1) was dated (at time of trial it was five and one-half months old and based on a joint interview with Richard that had occurred six and one-half months prior to the trial) and (2) did not reflect the fact that Jacqueline and Richard had severed their relationship. We find it somewhat disingenuous for Jacqueline to complain about the timeliness of the probation report in relation to the trial since her incommunicado status with her attorney was directly responsible for delaying the trial for at least three months. As to the severing of the relationship with Richard, this information was before the court via the testimony of adoptions worker Gerald Karp, who related that between March and August 15, 1985, he had discussions with Jacqueline in which she told him she was no longer living with Richard. However, the evidence also showed that during this period she threatened the social worker on Rose's case and threatened to kidnap Rose; hence, it would not have been unreasonable to discount the ameliorating effect of severing the relationship with Richard.
Jacqueline also quotes from the probation report a section describing an evaluation by Dr. James Ghazil, a drug rehabilitation specialist who counseled Richard and Jacqueline between 1982 and 1984. The report said Ghazil had "met with Jackie alone a couple of times and does not feel she is borderline schizophrenic. He feels she would function much better without [Richard]." Yet, Jacqueline on appeal ignores Ghazil's pessimism that either parent will overcome his or her drug problem and Ghazil's conclusion that parental rights should be terminated as to both parents. The report also related testing and evaluation conducted by psychologist Arthur Globe, which indicated Jacqueline was almost totally incapable of coping with life and perhaps a borderline schizophrenic.
We are bound by the established rules of appellate review that all factual matters will be viewed in the light most favorable to the prevailing party. (3) As the court in In re Heidi T., supra, 87 Cal. App.3d 864, 872, observed: "`... When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact....'" (Quotation from Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc. (1967) 66 Cal.2d 782, 784 [59 Cal. Rptr. *1025 141, 427 P.2d 805], italics in original.) (2b) We conclude there is no merit in Jacqueline's insufficient evidence claim.

II
(4) (See fn. 6.) In assessing Jacqueline's contentions regarding the trial proceeding in her absence[6] and without counsel, we first describe the situation and background confronting the trial court on the morning of trial.
Jacqueline appeared in court on March 11, 1985, on another matter when a citation on this petition was called for her in open court. She told the court she desired to contest the matter, and the court-appointed Attorney James Bunker, who was not present, as counsel for her. On April 12, trial was continued at the request of county counsel to allow time to give notice to the Indian Welfare Tribe (Richard's ancestry was believed to be Indian). Subsequently, four continuances  all but one directly resulting from Jacqueline's failure to contact Bunker  followed. On May 17, Bunker asked for a continuance because he had no address for Jacqueline and had not been able to contact her. (At this hearing, county counsel informed the court that Jacqueline was refusing to give her address to the adoptions office. County counsel objected, but the court granted a continuance because of its scheduling problems. On June 21, Bunker informed the court Jacqueline was incarcerated, and he asked for another continuance; he was granted a "last continuance" to August 2. On August 2, Bunker asked for another continuance, giving the following explanation: although Jacqueline had failed to appear for a misdemeanor arraignment on July 3, when he thought he could have contacted her, he talked to Richard, who gave him information on how to contact her. The court granted a continuance to August 30 and authorized payment of up to $150 for Bunker to hire a private investigator to find Jacqueline.
On August 30, Bunker appeared in court, but Jacqueline did not. Bunker told the court he had met with Jacqueline at 5 p.m. the previous day and given her a letter indicating it was mandatory for her to be at court at 8:30 the next morning; Jacqueline said she would be there. Bunker added he had just been informed Jacqueline was at an arraignment and he asked for a continuance to explore it. The court responded: "We can check to see if she is incarcerated. If she chose to go to one court instead of another court, I would not consider that a legitimate excuse for her not being here." Meanwhile, Bunker related that since his last court appearance on the matter he *1026 had met with Jacqueline on one occasion and set up another appointment, which she failed to keep. When he contacted her the previous afternoon, she told him she had forgotten about the appointment. He said that if Jacqueline was not presently incarcerated, he would ask to be relieved as counsel. The court clerk informed the court that Jacqueline was not in custody but had earlier telephoned juvenile court to indicate she was at misdemeanor arraignment. The court and Bunker engaged in the following colloquy:
"The Court: I conclude from all of this that she is just not interested in opposing this petition. And I don't see how you can adequately represent her interests under the circumstances.
"Mr. Bunker: If it protects the record, I would sit through, but I don't think it's justified for county expense and all for me to sit here.
"The Court: You feel that you do not have 
"[Bunker]: I have not had a chance to prepare for the matter; I have not had her cooperation in obtaining the background information. [¶] There is certainly nothing I could do for her without her assistance. And I feel there's been a complete lack of cooperation.
"The Court: I'll grant your motion to be relieved.
"Mr. Bunker: Thank you, your Honor.
"The Court: Thank you. We'll continue then as to the remaining. Of course there will be a prove up as to the mother and trial as to the father."
(5) There is no federal constitutional right per se to be represented by counsel in all parental termination proceedings. (Lassiter v. Department of Social Services (1981) 452 U.S. 18, 31-34 [68 L.Ed.2d 640, 652-654, 101 S.Ct. 2153].) Lassiter, supra, held the existence of a federal right to counsel is a matter for case-by-case adjudication. (Ibid.) However, California provides by statute for the right to counsel in parental termination cases. (§ 237.5.) (6a) Thus, here the primary inquiry is whether the trial court in relieving Jacqueline's court-appointed counsel and immediately conducting the trial violated Jacqueline's statutory right to counsel in this type of proceeding.
Section 232 et seq. provides for proceedings in which a minor child can be taken from the custody and control of the natural parents. These sections, which were originally included in the Welfare and Institutions Code, were transferred to the Civil Code in 1961 as part of a revision of the *1027 Juvenile Court Law. (Stats. 1961, ch. 1616, § 4, p. 3504.) In 1965, the Legislature enacted section 237.5, which mandated appointment of counsel for indigent parents in section 232 proceedings. (Stats. 1965, ch. 1530, § 3, p. 3624.) It was one of several procedural safeguards that had been omitted when the statutes were transferred. In 1981, the Legislature repealed and reenacted section 237.5, keeping intact the right of indigent parents in section 232 proceedings to have appointed counsel. (Stats. 1981, ch. 810, §§ 3-4, pp. 3144-3145.)
Section 237.5 now provides in pertinent part: "At the beginning of the proceeding on a petition filed pursuant to this chapter counsel shall be appointed as follows:
".... .... .... .... ....
"(b) If a parent appears without counsel and is unable to afford counsel, the court shall appoint counsel for the parent, unless such representation is knowingly and intelligently waived...."
(7) In the absence of a clear expression to the contrary, we must presume that in enacting section 237.5, the Legislature intended to insure indigent parents had a right to counsel in section 232 proceedings to protect their interests. That these interests are of no small measure has been repeatedly recognized. As this court observed in In re Joyleaf W. (1984) 150 Cal. App.3d 865, 868 [198 Cal. Rptr. 114]: "In freedom from custody and control cases, the state seeks permanently to sever the parent/child bond. The natural parent's desire for and right to the companionship, care, custody and management of his or her children is an interest far more precious than any property right." In In re Rodriguez (1973) 34 Cal. App.3d 510 [110 Cal. Rptr. 56], the court considered whether a father who was serving a life sentence in prison was entitled to appointment of counsel in a section 232 proceeding under then section 237.5. "It is clear from the provisions of section 237.5 of the Civil Code that legal representation must be provided indigent parents brought into court pursuant to its provisions, unless waived." (In re Rodriguez, supra, at p. 513, fn. omitted.) The provisions of the current section 237.5 are no less clear; counsel must be provided to indigent parents in a section 232 proceeding, unless waived.
Jacqueline appeared in court on March 11, 1985, and indicated she wanted to contest the petition and sought appointed counsel. At no point in the protracted proceedings did she explicitly waive her right to counsel under section 237.5. Can Bunker's request to be relieved as counsel be construed as Jacqueline's waiver of her right to counsel? We think not. Waiver of the *1028 right to counsel should be a matter calling for the personal decision of the client  not one consigned to counsel.
(6b) The question remains whether the trial court could infer a knowing and intelligent waiver from Jacqueline's actions. Before the trial court were the court minutes from five previous continuances, all but two of which were granted because Jacqueline either could not be found or had not met with her attorney. She assured Bunker the night before that she would be in juvenile court on August 30, 1985, but chose instead to go to misdemeanor arraignment court, neglecting to mention to Bunker she had a conflict in her schedule. The trial court's observation that Jacqueline displayed a certain lack of interest in the proceedings is borne out by the record. And, the court's and Bunker's observations that his representation was necessarily impaired by Jacqueline's actions also are supported by the record. But we cannot, on the entire record before us, equate Jacqueline's seemingly uninterested behavior with a knowing and intelligent waiver of her right to counsel. This was a woman whose unconventional lifestyle and drug and emotional problems obviously interfered with her ability to maintain normal communications with her attorney as well as other officials involved in the case. Nonetheless, on March 11, 1985, she indicated she wanted to contest the matter, and on August 30  the morning of the trial  she telephoned the court to say she was in misdemeanor arraignment court. Since there was not a knowing and intelligent waiver, it was improper under section 237.5 to relieve Bunker at that time.
Moreover, we also find the trial court had other alternatives, such as proceeding with the trial with Bunker's participation and presence even if Jacqueline was not there. Admittedly, Bunker's ability to prepare was seriously compromised by Jacqueline's lack of cooperation. But he was familiar with the case and the contents of the probation report, and it would have been preferable to conduct the trial with him providing the best representation possible under the circumstances rather than to proceed with no counsel at all.
However, under the circumstances of this case, we can only conclude the trial court's failure to discharge its obligation under section 237.5 was harmless. (See People v. Watson (1956) 46 Cal.2d 818, 837 [299 P.2d 243]; In re Justin L. (1987) 188 Cal. App.3d 1068, 1078 [233 Cal. Rptr. 632], in which the court used a Watson test to determine harmless error where a parent in a section 232 action was denied her statutory right to discharge counsel and represent herself.)
Jacqueline contends that the absence of an attorney created a situation in which no one was present to protect her interests by cross-examining adverse *1029 witnesses or arguing on her behalf. She contends she was prejudiced by the failure of anyone to cross-examine the author of the probation report and to demand a supplemental report.
We disagree. (8) The probation report, which is mandated by section 233, was admissible. "It has been held that `the written report mandated by the statute is admissible over a general hearsay objection so long as a meaningful opportunity to cross-examine and to controvert the content of the report is afforded.'" (In re Angelia P., supra, 28 Cal.3d 908, 926.) While Jacqueline can argue that relieving Bunker as counsel and proceeding in Jacqueline's absence eliminated the opportunity for cross-examination, she has not presented any persuasive argument that cross-examination of the author of the probation report would have led to a different result. For example, she argues that an attorney could have questioned the probation officer about her observation "Jackie might be able to become a marginal to adequate parent, if she obtained regular counseling and removed herself from her relationship with Richard and the lifestyle she falls into when with him." But this argument ignores the rest of the probation officer's comment: "However, she has such difficulty coping with life and caring for herself that she would require a major support system. She has not moved in that direction for any sustained period, since 1982 and presently has slipped back into her old lifestyle." As to demanding a supplemental probation report to secure new information, it is unlikely that the inclusion in a new report of the fact that Jacqueline had severed her relationship with Richard at that time  a point that Jacqueline repeatedly emphasizes on appeal  would have led to a different result. Through the testimony of adoptions worker Karp, the fact that Richard's and Jacqueline's relationship had been severed was made known during trial. Also, given Jacqueline's known track record, it is doubtful that a supplemental probation report that included information regarding the severing of the relationship would have changed the conclusions and recommendations of the probation officials. After all, any supplemental probation report also properly would have included information regarding Jacqueline's behavior with probation officials and her attorney from March through August 1985.
(6c) We also find unpersuasive Jacqueline's argument that she was prejudiced by the lack of objection to Karp's testimony regarding her. Richard's attorney called Karp as a witness. On direct examination, Karp did not discuss Jacqueline. On cross-examination by county counsel, Karp testified about recent drug use by Jacqueline. On appeal, Jacqueline contends an attorney could have objected to Karp's testimony about her because it was beyond the scope of the direct examination. Both sides acknowledge that when the trial court relieved Bunker as counsel and proceeded in Jacqueline's absence, the trial as to her was effectively transformed into a *1030 default action. We cannot say that if Jacqueline was represented by counsel and her case was handled as a normal trial that the county counsel would not have called Karp as a witness in its case-in-chief or as a rebuttal witness.[7]
Given the entire record, we conclude it is not reasonably probable that a result more favorable to Jacqueline would have been reached had Bunker not been relieved. (In re Justin L., supra, 188 Cal. App.3d at p. 1078.)[8] While concluding the proper procedure would have been for the court not to have relieved Attorney Bunker and to have conducted the trial with the attorney representing Jacqueline to the best of his ability under the circumstances, we find here there was no prejudice, no errors were committed in his absence and, as discussed in part I, ante, there was sufficient evidence to support the judgment. Accordingly, we affirm.

DISPOSITION
Judgment affirmed.
Kremer, P.J., and Staniforth, J.,[*] concurred.
NOTES
[1] All statutory references are to the Civil Code unless otherwise specified.
[2] See sections 232, subdivision (b), and 232.5, which state that at all times in termination proceedings, the court shall act in the best interests of the child.
[3] The trial court found the allegations of section 232, subdivisions (a)(2), (a)(3) and (a)(7), had been proved by clear and convincing evidence as to Richard and also ordered the children free from his custody and control. Richard has not appealed.
[4] Section 232, subdivision (a)(3), provides that a child may be declared free from the custody and control of a parent if the child's "... parent or parents suffer a disability because of the habitual use of alcohol, or any of the controlled substances specified in Schedules I to V, inclusive, of Division 10 (commencing with Section 11000) of the Health and Safety Code, except when these controlled substances are used as part of a medically prescribed plan, or are morally depraved, if the child has been a dependent child of the juvenile court, and the parent or parents have been deprived of the child's custody continuously for one year immediately prior to the filing of a petition pursuant to this section. As used in this subdivision, `disability' means any physical or mental incapacity which renders the parent or parents unable to adequately care for and control the child. Physical custody by the parent or parents for insubstantial periods of time shall not interrupt the running of the one-year period."
[5] Section 232, subdivision (a)(7), provides that a child may be declared free from the custody and control of a parent where the child: "... has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child."
[6] The fact the trial took place in Jacqueline's absence was not error. (See Adoption of Hinman (1971) 17 Cal. App.3d 211 [94 Cal. Rptr. 487].)
[7] Also, we note that with regard to Karp's testimony, Jacqueline on appeal would have it both ways. On appeal, Jacqueline does not hesitate to use those parts of Karp's testimony that she finds useful, such as her severing of the relationship with Richard.
[8] We note the trial court declined to grant judgment against Jacqueline pursuant to section 232, subdivision (a)(2), because there was insufficient evidence to sustain such a finding. Also, the probation report pointed out the insufficiency of the evidence to support a finding under section 232, subdivision (a)(1), and the trial court did not make a finding under this provision.
[*] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.