Filed 12/16/14  M.M. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| M.M. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A142869<br><br>(Contra Costa County Superior Court Case Nos. J13-01367, J13-01368 & J13-01369) |

Petitioners M.M (father) and A.E. (mother), the parents of J.M. I—their 13-year old daughter— J.M. II—their seven-year old son—and J.M. III—their five-year old daughter[1]—petition this court to set aside the juvenile court's order setting a hearing, pursuant to Welfare and Institutions Code section 366.26 to select and implement a permanent placement plan for the children.  For the reasons stated below, we deny the petitions.

---

[1]     The minors have the same initials:  J.M.  Thus we refer to the parents' 13-year old daughter as J.M. I, their seven-year old son as J.M. II and their 5-year old daughter as J.M. III in this opinion.  We intend no disrespect to the minors by referring to the minors in this fashion.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On or about May 31, 2012 the minor children were taken into protective custody after the Livermore police were summoned to parents' home and found mother intoxicated in front of the home, bleeding from a wound to her toe. The officers then entered parents' home and observed father asleep. After several attempts, the officers were able to awaken father at which time he informed them he'd fallen asleep after ingesting prescribed pain medication. Father appeared to be incapacitated and he could not provide the officers with the names of his children. The officers described the family home as "unfit and unsanitary," smelly with garbage throughout the home, scattered belongings, dirty dishes with rotten food, knives on the floor, broken glass on the kitchen floor, dirty carpets and foul-smelling food in the refrigerator. A detention hearing was held June 4, 2012 and the minors were detained.

On July 6, 2012, amended petitions[2] were filed by the Social Services Agency of Alameda County alleging that minors came within the provisions of Welfare and Institutions Code section 300, [3] subdivisions (b) and (g) as a result of the officers' observations at parents' home on May 31.

The First Amended Petitions (FAP) also alleged that both parents had substance abuse problems that periodically interfered with their ability to care for their children. Both parents took prescription medications: the father, for bi-polar disorder and for back problems and the mother for depression. Three of the parents' children were exposed at birth to marijuana, opiates, amphetamines, and barbiturates. The couples' fourth child had been diagnosed with attention deficit disorder but was taking the father's medication because the parents had not picked up the child's prescribed medication. The FAPs also alleged that mother failed the standard sobriety tests administered by Livermore officers

---

[2]     Throughout this case individual petitions or amended petitions were filed for each of the minor children. Although they each specify a particular minor, there is a great deal of overlap since the children were exposed to the same general conditions.

[3]     All further unspecified statutory references are to the Welfare and Institutions Code.

on May 31, that she refused medical treatment and was arrested for creating a public disturbance.[4] The FAPs also alleged that Father was severely incapacitated and unable to care for himself when the officers contacted him on May 31 at parents' home and he was subsequently hospitalized in a psychiatric facility.

The FAPs further alleged that mother has a history of arrests from 1992 through 2013 for receiving stolen property, theft by forged access card, burglary, driving under the influence of alcohol/drugs and other crimes and that she sustained misdemeanor convictions, in 1992, 2010, and 2013. Father was arrested numerous times between 2001 through 2012, for petty theft, driving under the influence, battery of spouse, battery with serious bodily injury, grand theft and other crimes. He, not unlike the mother, sustained two misdemeanor convictions, in 2008 and 2010.

The Agency recommended that the minors be declared dependents of the court, and that the minors continue to reside with their parents and that the family receive family maintenance services. In addition, parents were to submit to twice weekly random drug testing, continue their psychotherapy, and to enter and participate in a parenting class.[5]

In August 2012,[6] the juvenile court sustained the allegations of the amended petitions, declared the minors dependants of the juvenile court, ordered the children

---

[4]    Four minors were originally taken into custody. Only three were still under age when the court set the section 366.26 hearing. It was also reported that the mother gave another daughter to her sister shortly after the child was born and that the child was adopted. There is, however, no official record of that and the Alameda County Social Services Agency was unable to locate the child.

[5]    The record submitted to this court fails to include the complete initial case plan. The information contained in the footer of the document reflects that the case plan is a seven-page document; however only the first two pages were submitted to this court. The record before us reflects the initial goals for the mother and that one of father's initial goals was to continue psychotherapy. Our reference to father's additional goals is taken from the Contra Costa County Agency's opposition to the petition.

[6]    Again, this date is taken from the Contra Costa County Agency's opposition.

placed with parents and ordered the Agency to provide parents with family reunification services.

The juvenile court conducted a family maintenance review in January 2013 and ordered that minors continue to reside with parents. On April 18, 2013 the Agency filed an interim review report which summarized the parents' progress as follows: "Since the last Court hearing, the parents have reported to the Agency that they have followed up with matters but when the Agency calls to verify information, minimal steps have been completed with excuses. . . . Without a designated person [from the extended family] to help the parents to follow up on critical matters, the basic needs of the children will continue to be neglected; and other pertinent household and financial matters will continue to be unmanageable . . . . The parents' ability to retain information and problem solve situations remains seriously concerning as they continue to demonstrate limited ability to maintaining housing, budgeting; and following up with medical, mental health, dental and educational matters at a basic level. . . . It is evident that there are specific kinds of medications showing up positive for amphetamines in addition to having positive tests for marijuana."

On May 1 the minors were taken into protective custody and placed with their maternal aunt. The Agency opined that the children were in imminent danger and removal from their home was necessary as a result of parents' failure to comply with their case plan in the following respects: parents failed to submit to psychological evaluation, failed to ensure regular and timely school attendance of J.M. I, failed to enroll J.M. II and III in school, did not follow through with medical assessments for J.M. I, abused non-prescribed illegal drugs and mismanaged their use of prescription medication, failed to supervise the minors adequately and failed to maintain a stable abode for the minors.

On May 3, 2013 the Agency filed supplemental petitions alleging parents' failure to comply with the case plan as described in the May 1 report. On May 6, 2013 the Agency recommended that the juvenile court detain the minors and place them with their maternal aunt pending further investigation. After a hearing on May 6, 2013 the juvenile

4

court detained the minors, finding that allowing the minors to reside in their parents' home would be contrary to their welfare and set the matter for an uncontested hearing.

Thereafter on June 19, 2013, the Alameda County juvenile court conducted a hearing on the supplemental petitions. The juvenile court sustained the petitions, ordered that the family be provided with family reunification services, and ordered that the minors continue in placement with their maternal aunt.

On November 21, 2013 Alameda County Social Services recommended that the case be transferred to Contra Costa County, where the parents recently moved. That report indicated that "[t]he parents have yet to engage in Court Ordered Case Plan services to show that they have addressed the concerns that resulted in their children's removal from their care and custody. Neither parent[] has participated regularly and made substantive progress in court-ordered treatment programs, made substantial progress in complying with the case plan, or alleviated or mitigated the causes necessitating out-of-home placement. Although always cordial, the parents, primarily [the father] maintain that the children were removed from their care because the previous Child Welfare Worker misrepresented their situation. The parents have become increasingly less responsive to the undersigned's attempts to speak with them about their services." On December 12, 2013 the Alameda County juvenile court found that Alameda County Social Services had provided reasonable services and that the parents' progress had been minimal; it ordered that the case be transferred to Contra Costa County and that family reunification services be continued. On January 8, 2014 the Contra Costa County juvenile court accepted the case.

On February 13, 2014 Contra Costa County Children & Family Services filed supplemental petitions, alleging that the children needed to be removed from their relative caregiver. The supplemental petitions alleged that the maternal aunt left the children in their parents' care for several weeks without approved supervision in a house that lacked utilities, where the refrigerator was dirty and moldy, where garbage, old food, plates with moldy food and dirty dishes were in the home, and where marijuana was

within the children's reach.  The children were then detained from the relative caregiver and placed in foster care.

In an interim court report, dated April 16, 2014, the Contra Costa County Agency reported that the parents were spending a lot of time with their family due to the death of the maternal grandfather.  However, the father had not followed through on the referrals that he had been given.  The mother reported leaving messages for therapists, but had not yet received any return calls.  Of seven drug tests scheduled for mother between February and March 2014, mother had three positive tests for THC and amphetamines and four no-shows.  Father, who had also been scheduled for seven drug tests in that same time frame, had tested positive for THC, barbiturates, oxycodone and amphetamine on three occasions; he was a "no-show" four times.

In advance of the June 16, 2014, 12- month review hearing, the Contra Costa County Agency prepared an updated report, which indicated the parents' drug use remained essentially unchanged.  The report noted that in the months of April and May they were each scheduled to test eight times.  They both tested positive for amphetamine and THC on one occasion; they both missed the other seven tests.

In a Status Review Report prepared for the 12-month permanency hearing the Contra Costa County Agency recommended that the parents continue to receive family reunification services "due to the children's ages and the connection the children have to their parents."  "Although the parents have shown a lack of follow through with services provided them through Alameda County, they have complied with their psychotropic medication needs and found a therapist for [the father].  It is apparent that the children are very bonded to their parents and they want to return home as soon as possible.  This social worker has discussed time lines with the parents and they seem to understand that they are running out of time to reunify with their children so they would like to try to do what they can in the time given to get their family back together."  The court, however, declined to follow the recommendation.  Describing the case as "really tragic," it found that the parents had done "virtually nothing other than visit" the children in order to meet

6

the case goals. It focused specifically on the positive and missed drug tests, suspended all services, and set the matter for a contested hearing in August 2014.

On August 6, a contested 12-month review hearing commenced. At the outset of the hearing, the attorney for the Contra Costa County Agency conceded that the Agency's recommendation to continue services was not supported by the evidence. Specifically, the agency attorney agreed that in order for the court to continue services it would have to find that the parents had made substantial progress in their case plans, which she did not believe to be supported by the evidence. "[F]rom a purely social worker perspective" the agency was aware that the children very much wanted to return home and was hoping for "a miracle" so that the children could return home.[7]

Evidence was introduced showing that the mother had not attended individual psychotherapy or family therapy since the case was received by Contra Costa County in January 2014. She contacted a psychiatrist and received prescriptions from him. The mother had also obtained a medical marijuana card on March 23, 2014. She had stable housing with her mother-in-law. The social worker did not believe that the mother had complied with that portion of her plan requiring her to obtain medical and psychological treatment. Neither did she believe that the mother had shown any insight into her own conduct. In June and July the mother continued either to test positive for THC and amphetamines or simply did not show up for her required testing.[8] On August 1, 2014 the mother began an outpatient substance abuse program, which the social worker described as a good first step for her, but believed that an inpatient program would be preferable. In August the results of two of the mother's drug tests were available — one

---

[7]   At the beginning of the July 7, 2014 hearing the judge acknowledged receiving a letter from J.M. I, written on behalf of her siblings and herself. The letter fervently pleads with the judge that she allow the children to return to their parents.

[8]   The social worker believed that the mother's drug test results were consistent with her prescribed medications. Although she emphasized that she was not a pharmacist, so she could not say how a given substance would manifest itself, if at all, in the testing, she seemed to concede, for example, that amphetamine salts or tablets would show up as amphetamine.

was positive for amphetamine; the second was negative for all substances. Even after the mother began her substance abuse treatment, she had not acknowledged to the social worker that she needed that treatment.

The father, during the June-July time period, either failed to show up for testing or tested positive for THC, oxycodone and amphetamines.[9] On August 21, 2014 the father testified at the contested hearing that he had taken all his medications as prescribed. He admitted to having tested positive for THC, but indicated he had stopped using marijuana about a month earlier and was willing to abstain from future use. On July 30, 2014 he had started an outpatient drug program.[10] He also testified that he had completed a parenting class, and had started therapy in approximately June 2014.[11]

When asked why the children were removed from his care, father replied, "The court ordered them out of our house." When pushed to elaborate, father stated that he "guess[ed]" the court made that order due to substance abuse. He later conceded that he was sure that was the reason. He stated, however, that he did not know why the children had not been returned to his care.

The case worker testified that she spoke with the parents a few times each month, emphasizing that they both should enroll in inpatient drug treatment. She acknowledged the difficulty of finding appropriate inpatient programs, referred them to the "EOS" [early intervention specialist], and encouraged them to start an outpatient program until they could find a suitable inpatient program.

In addition to considering the witness testimony, the juvenile court also noted some aspects of the parents' appearance.

---

[9] Although the father had a medical marijuana card, he did not have a prescription for marijuana. Thus, the Contra Costa County Agency believed that his testing positive for THC was inconsistent with his prescribed medications; his testing positive for the other drugs was consistent with his prescribed medication.

[10] He had begun to contact drug treatment programs in approximately June 2014, but had some difficulty finding a suitable program.

[11] He had difficulty finding a therapist who would treat him because many of the therapists to whom he was referred did not accept Medicare.

"THE COURT:  Okay.  And I just have to say for the record, both Mother and Father who appear here today appear to the Court to be under the influence of a central nervous system stimulant, as both Father has not been able to sit still in his chair and is constantly in motion, and Mother has significant facial twitching.  And I think it's fairly clear to the Court at least that both parents continue to use substances that contain a form of central nervous stimulant.

"[FATHER'S ATTORNEY:]  Your Honor, Father informs me that that is a side effect of the lithium that he takes.

"THE COURT:  Could be.  And we had the discussion many times in this courtroom about prescriptions and whether having a prescription is sufficient to show that you're a safe custodial parent, and it is not."

 When the court ordered the termination of services and the setting of the section 366.26 hearing, after reviewing various historical facts concerning this family, the court returned to this theme:

"Father is so jittery physically that even when he speaks, his voice waivers because he is so jittery from the substances that he puts in his body, and he has stated to the court before the reason why he's jittery is because of his medication.

"And mother, on the other hand, looks like the shell of a human being quite frankly.  She is emaciated, she has a tick, and it is clear to me that both parents are on central nervous stimulants—central nervous stimulants.  And whether they're prescribed or not, quite frankly, in terms of these proceedings, it doesn't matter because those substances and the parents' use of those substances has made it — made them incapable of providing a safe home and stability for these children . . . ."

When the court issued its decision, it first noted that all the children had tested positive for some illicit substance at birth.  It noted that the parents were initially given an

9

opportunity to keep the family together and were provided family maintenance until May 2013 when the children were removed and reunification services started. The children were then placed with their aunt, who relinquished custody, so the children unofficially were back with the parents at their unsanitary, substandard home. The school-aged children had very significant absences and tardies. Then, after making its observations about the parents' jitteriness and ticks, the court concluded, "I cannot possibly make a finding that I would need to make to extend services to the 18-month mark . . . [¶] . . . [¶] . . . I would have to find by clear and convincing evidence that additional reunification services are in the best interest of the children and that the parents are making significant progress in their case plans, and I don't see how I can possibly make that finding in this case based on the state of the record." The court then terminated services and set the matter for a section 366.26 hearing on December 17, 2014.

On August 27, 2014, the father filed timely notices of intent to file writ petitions for all three children. The mother did the same on August 28, 2014. On September 26, 2014 both parents filed writ petitions; we issued an order to show cause on September 29, 2014, and the Contra Costa County Agency filed an opposition on October 14, 2014. No request for oral argument having been filed by the deadline, oral argument was deemed to have been waived on October 22, 2014.

## DISCUSSION

Parents contend the juvenile court erred in finding that there was no substantial probability the minors could be returned to them and safely maintained in their home with six additional months of reunification services. The applicable law governing this case is clear. To qualify for six months of reunification services at the 12-month permanency review hearing, the court must find that there is a "substantial probability" that the child will be returned to the parents' custody within that extended time period.[12] (§ 366.21, subd. (g)(1).) The factors the court must consider in determining whether "a

_____

[12] Alternatively, the court may base a ruling to continue services on a finding that reasonable services have not been provided. That issue is addressed below.

10

substantial probability of return" has been established are as follows: 1) parents "consistently and regularly contacted and visited" the child, 2) parents "made significant progress in resolving problems that led to the child's removal," and, 3) parents demonstrate "the capacity and ability both to complete the objectives of his or her treatment plan, and to provide for the child's safety, protection, physical and emotional wellbeing, and special needs." (*id.* subd (g)(1)(A), (B), and (C).)

The case plan adopted by the juvenile court required each parent to attend individual therapy, to enter into and participate in a parenting class, and to comply with drug testing by January 2013. As of June 2014 — more than a year later — neither parent had yet started psychotherapy. Mother had not begun either individual or family therapy at the commencement of the August 6, 2014, contested hearing. The case worker testified that she had had an ongoing dialogue with the mother concerning her need for substance abuse treatment and, up through the time of the contested hearing, the mother had never acknowledged her need for treatment. Furthermore, the mother was not regularly testing for illicit substances. The case worker further testified that the mother had shown no insight into her own conduct that gave rise to the dependency proceeding.

Regarding father's compliance with the case plan, the worker noted that father did not submit to drug testing as required. In part due to problems finding a therapist who would accept Medicare, the father had only begun psychotherapy in approximately June 2014. And father, like mother, showed a long-standing lack of insight and failure to accept responsibility for his situation. In November 2013, the father attributed his loss of custody of the minors to the social worker's misrepresentations. At the August 2014 contested hearing, father when questioned, was reluctant to take responsibility for the children's having been detained and could offer no explanation as to why the children had not been returned to the home. Thus, both parents resisted their treatment plans and neither achieved the necessary insight to overcome the problems which necessitated intervention in the first place. Therefore, we conclude substantial evidence supports the juvenile court's finding that parents failed to make significant progress in "resolving the problems that led to the minors removal" and that they failed to demonstrate "the

11

capacity and ability both to complete the objectives of [their] treatment plan[s]." Thus, the juvenile court did not err when it terminated services and set the section 366.26 hearing. (*James B.* v. *Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) [13]

Father posits several additional arguments in support of his request that we reverse the juvenile court's order setting a hearing pursuant to section 366.26. Father argues that (1) there was substantial evidence that the children could be returned to the father within six months; (2) the juvenile court improperly terminated the father's reunification services prior to the 12-month hearing without adequate notice or opportunity to be heard in violation of his right of due process; (3) the juvenile court improperly considered matters unsupported by the record; and (4) the agency failed to provide the father with reasonable services. Mother, joins in the first three of Father's arguments and, in particular, she highlights her record of visitation with the minors in support of her contention that the trial court erred in finding no substantial probability of return of the minors within the statutorily mandated six-month period proscribed by section 366.21. subdivision (g). Mother also contends that she has made significant progress in resolving the problems that led to the children's removal, and demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for the children's safety, protection, well-being, and special needs. Both parents argue that they made sufficient progress in meeting the objectives of the case plan such that the juvenile court should not

---

[13]     The Contra Costa County Agency essentially agrees that the parents failed to make significant progress in resolving the problems that necessitated intervention. However, the Agency acknowledges, as it must, that in the juvenile court proceeding below it recommended that services be continued and that it cannot change its position in this court. (*Ernst v. Searle* (1933) 218 Cal. 233, 240-241.) Below, the agency's counsel conceded that (1) a necessary finding for the court to have continued services was that the parents made substantial progress in their case plans and (2) that finding was not supported by the evidence. It elaborated that "from a purely social worker perspective," given the intensity of the children's desire to return home, that the agency was requesting that services be continued in the optimistic hope that "something would change and a miracle would happen that the parents would actually engage in the services . . . ." In its opposition to the petitions filed in this court, the agency reiterates that after reviewing the parents' petitions, it still believes there is an insufficient basis to order the juvenile court to modify its order.

have precipitously terminated services, but should have granted them an additional six months of services.

As we stated above, substantial evidence supports the juvenile court's finding that parents failed to make significant progress in resolving the problems that led to removal of the minors. In essence parents ask this court to re-weigh their accomplishments and failures in the course of the services they received. However, our task in resolving the parents' contention is guided by well-settled law. Our inquiry here is limited to a determination as to whether substantial evidence supports the lower court's findings; we do not weigh evidence, consider the credibility of witnesses or resolve conflicts in the evidence. (*James B., supra,* 35 Cal.App.4th at pp. 1020-1021, citing *Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370.) Thus, we are not at liberty to weigh, as the parents request, factors such as the parents' visitation with their children, the ability to obtain appropriate housing, and participation in outpatient substance abuse treatment against other factors such as their tardy initiation of individual therapy and their lack of acceptance of responsibility for the situation. Instead we examine the parents' compliance with the case plan to discern whether substantial evidence supports the juvenile court's termination order. The juvenile court has weighed the relevant factors; and we are satisfied that there is substantial evidence to support its decision.

Parents also object to several comments made by the juvenile court judge at the conclusion of the 12-month contested hearing regarding their demeanor during the hearing as well as the conclusions the court derived from its observations. Each parent contends that it is improper for the finder-of-fact to consider knowledge gained from outside the courtroom or in another case such as the juvenile court's opinion that they were using a central nervous system stimulant, based on its observation of them in the court room. Even assuming the trial court erred in making these comments, we conclude any error in doing so was harmless. Given the parents' significant delays in initiating therapy and their lack of insight into their responsibility for the problems that necessitated the juvenile court's intervention in this case, we conclude it is not reasonably

13

probable that a more favorable result to the parents would have otherwise been obtained by the parents. (See *In re Nalani C.* (1988) 199 Cal.App.3d 1017, 1030.)

We also reject parent's constitutional due process argument that the court's termination of services, which had not been recommended by the agency, violated his constitutional rights. Reunification services are a benefit, not a constitutional entitlement. (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 60.) Accordingly, the juvenile court has discretion to terminate those services at any time, depending on the circumstances of the case. (See *In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242 [father's poor performance in reunification justified the court terminating services before the expiration of the six-month period].) Parents' assertion that they were deprived of notice necessary prior to termination of services fares no better. Both parents objected to the court's discontinuing services on July 7, 2014. This matter was set for a contested hearing with respect to whether parents were entitled to an additional six months of reunification services (§ 366.21, subd. (g)). The agency's recommendation regarding services notwithstanding, the parties were on notice that the court was required to find a substantial probability that the minors could be returned to the parents' custody with an additional six months of services. In addition, parents were on notice that in the event the trial court determined that parents failed to make "substantial progress" in alleviating the reasons for removal of the minors, the trial court was empowered to terminate reunification services and set a section 366.26 hearing to implement a permanent plan for the minors. Knowing that the juvenile court was not bound by the Agency's recommendation and knowing that their progress (or lack thereof) was critical to a determination about whether to continue services, the parents can hardly call foul when the juvenile court ordered that services be suspended. The juvenile court, at parents' request, conducted a contested hearing which spanned several court appearances. Parents and the Contra Costa County Agency presented evidence addressing parents' compliance with case plan objectives and reunification services provided to them by the Agency. If, at the conclusion of the contested hearing, the juvenile court had determined that substantial progress had been made and that it was appropriate to reinstate services, it

14

could and would have done so. Having reviewed this record, we reject parents contention that their due process rights were violated.

Finally, we address the father's argument that he was not provided with reasonable services. In order for the services offered to be considered reasonable, the agency must have identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents, and made reasonable efforts to assist the parents with difficulties in complying with the case plan. (*Ibid*.) Nonetheless, where the reasonableness of the supervising agency's efforts was not raised in the juvenile court, it cannot be raised for the first time in the appellate court. (See *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886.) The father fails to identify any point in the record below where he challenged the agency's efforts. Similarly, our review of the record does not disclose where the issue was raised below. Consequently, the issue is waived.

Even assuming that the issue was not waived, we have no trouble concluding that father received reasonable services. The standard is not whether a parent received ideal services, but whether they were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) In essence, father contends that the referrals he was given for therapists were inappropriate because the therapists either did not accept Medicare or they simply did not exist. We agree that an updated and current referral list, which includes information about what insurance or other coverage the therapist accepts would be ideal. But the father had no difficulty, once he was so motivated, to locate a suitable therapist by searching the Medicare website. And, there is no evidence before us that he even began his search for a therapist promptly. In all events, the Alameda and Contra Costa agencies provided the referrals for the services required including drug treatment, drug testing, parenting classes, psychiatric and psychological treatment. They addressed the dynamic situation with the parents — first attempting to maintain the children in the home and then attempting to return them to the home. The Contra Costa County Agency identified and worked to resolve the problem created by the sham placement of the children with the relative who simply allowed the parents to resume

15

their unauthorized custody of the children.  In short, the agencies identified the problems requiring intervention, offered services intended to resolve those issues, maintained contact with the parents, and attempted to resolve problematic issues that arose during the case.  On this record, the services provided were not inadequate simply because the referral list included inappropriate referrals.

### DISPOSITION

For the above-stated reasons, we deny the petition for an extraordinary writ. Because the section 366.26 hearing is set for December 17, 2014, our decision is immediately final as to this court.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)


_____

Jenkins, J.


We concur:


_____

McGuiness, P. J.


_____

Pollak, J.