Filed 8/25/16  In re Mia B. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re MIA B., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARIA F., <br><br> Defendant and Appellant. | B265923 <br> (Los Angeles County <br> Super. Ct. No. CK04936) |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Maria F. (Mother), mother of Mia B., age eight, appeals the juvenile court's dispositional order removing Mia from her custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGOUND

Mother and Mia's father, Luis B. (Father) are mentally disabled. The family has a lengthy history with the Department of Children and Family Services (DCFS). In a case involving physical abuse of Mia's older half-sibling, Ashley C., Mother received reunification services between 1993 and 1995, and voluntary family maintenance services from 1995 to 1998.[1] Between 2002 and 2003, DCFS again provided Mother family maintenance services. In May 2009, a petition was sustained on behalf of Mia, her older brother Juan B., and Ashley.[2] In 2010, both Mother and Father received family maintenance services.[3] In 2014, DCFS substantiated allegations of general neglect with respect to Mia, and began providing family maintenance services to the parents and wraparound services to Mia.

The family was still receiving the above described services when on February 16, 2015, Father was arrested for domestic violence/making criminal threats. After interviewing Mother and Mia, the caseworker learned the following: Father had picked up a knife, saying to Mia: "I['] m going to kill your mom" or "I'm going to kill you and your mom." Mia saw Father holding a knife and started

---

[1] Ashley, the child of a prior relationship, is now an adult.

[2] The court found true that Father struck Juan with a remote control, put him in a bathtub and poured hot water on him, and threw him onto a sofa. In a supplemental petition, the court found true that Mother was unable to provide regular care and supervision for Juan, and had failed to comply with the court's order of monitored visits for Father.

[3] In February 2011, Mia was returned to her parents. Juan is currently in a legal guardianship.

to cry. When Mother initially tried to call 911, Father unplugged the phone. Mother and Mia reported three prior similar incidents: one in January, when Father told Mother if she no longer wanted to be with him, he was going to get a knife and kill her and the children; one on February 6, when Father threatened to kill Mother and Mia; and one on February 9, when Father threatened Mother.[4] Mother and Mia reported that in addition to the threats of physical violence, Father verbally abused them, calling the child "dumb" or "stupid." In addition, Father had once grabbed Mother's wrist, leaving a bruise, and a few years earlier, had choked her.

Father did not deny that on February 16, he had threatened to kill Mother, and had gone to the kitchen and picked up a knife. He claimed it was an isolated incident and that he did not mean to carry out his threat, but admitted he had thought about killing Mother.

Mother agreed that she and Father should not continue their relationship and that Father should move out of the family home.[5] She thereafter obtained a three-year restraining order precluding Father from contacting or coming near her or Mia. Father agreed to abide by the restraining order. Mother and Mia enrolled in counseling. The detention report recommended detaining Mia from Father, and allowing her to remain in Mother's care. The court issued the requested detention order in March 2015. The court's order did not amend the restraining order to allow visits for Father.

---

[4] Mother later reported that Father had actually thrown a knife at her in January, missing her leg by a few inches. Mother had not reported any of these incidents to the family maintenance service workers, although she had reported that Father was verbally and emotionally abusive.

[5] Indeed, the series of recent threats described by Mother and Mia appeared to have been precipitated by Mother's decision to terminate the relationship and her attempts to persuade Father to move out of the family home.

The May 2015 jurisdictional report stated that Father called Mother's home and spoke to Mia while the caseworker was visiting the family. Mother reported he had been violating the restraining order by repeatedly calling the home, and by regularly waiting in a park near Mia's school to see Mother and Mia. On one occasion, Father followed Mother and Mia home, and Mother called the police.

Father reported that Mother had called him, asking him to pick up fast food for her and Mia, and that he had met them in the park near Mia's school to deliver it. He admitted following Mother home once after seeing her and Mia in a car with Mother's new boyfriend. Mia said she wanted Father to stop calling and her parents to stop arguing. Father's sister said Mother had called Father multiple times, and that both appeared to be disregarding the restraining order. One of the service providers for Mother and Father confirmed that she had heard a message on Father's phone from Mother, asking Father to run an errand for her. Another provider reported that Mother was verbally aggressive and manipulative. Both providers believed Mother was not capable of meeting Mia's emotional needs, and that the child's behavior had been significantly better in the past, when she was in foster care. The wraparound facilitator reported that Mother was not cooperative. She would become enraged with providers when they questioned her decisions. She had asked providers to leave prematurely when they arrived at her home to work with her, cancelled their appointments, or simply refused them entry. She had refused to take Mia for a psychiatric assessment recommended by Mia's school, and waited two weeks to get a doctor's prescription filled for the child. In addition, even when advised not to talk about Father in Mia's presence, Mother would say things about him that caused the girl to cry.

The caseworker concluded the parents did not understand the seriousness of their domestic violence and its effects on Mia, as they continued to violate the restraining order and become involved in verbal disputes in front of Mia.[6] Accordingly, she recommended detaining Mia from Mother. On May 20, 2015, the court issued an order in conformance with the recommendation.[7] In so doing, the court stated that it appeared existing protective measures had not been effective in keeping Mother and Father apart.

At the June 2015 jurisdictional/dispositional hearing, the court found true that Mother and Father "have a history of domestic violence and engaging in violent altercations in the presence of the child," and that on February 16, 2015 and prior occasions, Father: (1) "held a knife and threatened to kill [Mother and Mia]"; (2) choked Mother, threw a knife at her and grabbed her wrists, inflicting a bruise; and (3) was incarcerated on a charge of criminal threats. The court further found that Mother "failed to protect the child in that [she] allowed [Father] to reside in the child's home and have unlimited access to the child," that "[r]emedial services failed to resolve the family's problem[s]," and that Mother and Father "continue to engage in violent altercations." Finally, the court found that the parents' actions "endanger[ed] the child's physical and emotional health and safety" and "place[d] the child at risk of serious physical and emotional harm damage, danger and failure to protect" within the meaning of Welfare and Institutions Code, section 300, subdivisions (a) (physical abuse) and (b) (failure to protect).[8]

---

[6]    Mia was clearly affected by the behavior. She misbehaved badly in school, was making no academic progress, and had multiple toileting accidents.

[7]    At the hearing, Father's counsel acknowledged that Mother and Father "have an ongoing relationship." Mia was placed with non-relative extended family members.

[8]    The court struck allegations made under subdivision (c) (emotional abuse). Undesignated statutory provisions are to the Welfare and Institutions Code.

When the court turned to disposition, both DCFS's and Mia's counsel argued that the girl should be removed from Mother and Father. Mia's counsel noted that despite Mother's receiving services and the existence of a criminal protective order, Mother continued to violate court orders, necessitating Mia's removal. Mother's counsel asked that the girl be returned to her as she was participating in the recommended services. The court found by clear and convincing evidence that there was a substantial risk of physical detriment to Mia if she were returned home, that there were no reasonable means to protect her without removal, and that reasonable efforts had been made to prevent or eliminate the need for removal. The court emphasized that jurisdiction had been based on "multiple instance[s] of domestic violence," and pointed out that "there were services in place prior to Mia being detained to try and keep Mia at home safely. And those services were not effective." Mother appealed.[9]

## DISCUSSION

After finding that a child is a person described in section 300 and therefore the proper subject of dependency jurisdiction, the court must determine "the proper disposition to be made of the child." (§ 358.) "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of [at least one of the circumstances listed in paragraphs (1) to (5)] . . . ." (§ 361, subd. (c).) Subdivision (c)(1) of section 361 permits removal if "[t]here is or would be a substantial danger to the

---

[9] The court also ordered mother to participate in a parenting class, regional center services, and individual counseling to address domestic violence, domestic violence prevention, and the effects of domestic violence on children. Mother does not challenge these aspects of the dispositional order.

physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.) "'""The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]'" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) Although the juvenile court's findings must be made on clear and convincing evidence, "[o]n review, we employ the substantial evidence test, however bearing in mind the heightened burden of proof." (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

There is no dispute that Father repeatedly threatened to kill Mother and Mia after learning that Mother wanted to break up with him. On one of those occasions, he threw a knife at Mother. On the most recent, he went into the kitchen and grabbed a knife while spelling out his violent intent as Mia watched, causing the girl to suffer great distress. Despite Mother's long history of child neglect and receipt of services, DCFS and the court initially permitted Mother to retain custody of Mia as long as she obeyed orders and kept up with her programs. Mother endangered herself and Mia -- and violated the restraining order -- by continuing to maintain contact with Father and allowing him access to Mia. In addition, she was uncooperative and antagonistic toward the people trying to help her improve her parenting skills. The court could reasonably conclude that the only way to ensure Mia's safety was to remove the child from Mother's care.

Mother contends the court and DCFS did not exhaust alternatives to removal. To the contrary, Mother was given every opportunity to avoid losing custody of her child. Her repeated violations of the restraining order and her failure to cooperate with service providers led the court reasonably to conclude there was no effective alternative to removal.

Mother contends we should view the threat incidents as a "single, short" period of bad judgment, unlikely to recur. The family's history with DCFS convinces us otherwise. Father has been engaged in acts of physical abuse and domestic violence, and Mother has been failing to protect her children from Father for some time. Mother herself reported that Father was continuously emotionally and verbally abusive, and that he had bruised and choked her on prior occasions. While even a single threat to kill one's partner and child because he or she wants to separate would support a finding of substantial danger, here, there were four such threats. The court's dispositional order was supported by substantial evidence.

# DISPOSITION

The dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

9